[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12417

_____

D.C. Docket No. 1:13-cr-20557-KMW-3


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALEXANDER DIMITROVSKI,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 2, 2015)

Before HULL, BLACK and MELLOY,* Circuit Judges.


BLACK, Circuit Judge:

_____

* The Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Defendant Aleksander Dimitrovski appeals his sentence, imposed after pleading guilty to one count of receiving, possessing, and selling stolen goods in violation of 18 U.S.C § 2315.  Dimitrovski contends the district court erred in applying a two-level enhancement under U.S.S.G. § 2B1.1(b)(14)(B), which applies "[i]f the offense involved an organized scheme to steal or to receive . . . goods or chattels that are part of a cargo shipment,"[1] because his offense involved only a single transaction of stolen cargo.  We affirm.

## I.  BACKGROUND[2]

A.    *June 26, 2013 – A cargo shipment is stolen at a truck stop*

On June 26, 2013, an eighteen-wheeler tractor-trailer transporting a shipment of L'Oreal brand beauty products, including hair-color and makeup, was stolen from a truck stop in Antioch, Tennessee.  The shipment was en route to a customer warehouse in Chattanooga, Tennessee and had originated from a L'Oreal distribution facility in Streetsboro, Ohio.  The shipment's two invoices showed it

---

[1] Prior to November 1, 2007, the organized scheme enhancement applied only if the scheme involved stolen vehicles and vehicle parts.  *See* United States Sentencing Guidelines App. C.  In response to concerns over increased instances of organized cargo theft operations, the Guidelines Commission expanded the organized scheme enhancement to cover cargo theft.

[2] Because Dimitrovski did not proceed to trial, these facts derive from the factual proffer and the offense conduct section of Dimitrovski's Presentence Investigation Report (PSI).  The offense conduct section of Dimitrovski's PSI contained information gathered from, among other places, post-arrest interviews of Dimitrovski and his two codefendants, Jorge Brache and Justo Aranda Maytin.

was carrying thirty-four pallets[3] of L'Oreal goods.  The driver reported he went inside the truck stop to take a shower and came back out to discover his tractor-trailer was gone.

Sometime on or before Friday, July 12, 2013, Dimitrovski, who owns a trucking company called RUS Corporation, obtained $10,000 by factoring invoices with Capital Depot.[4]

B.      *July 12, 2013 – Dimitrovski purchases and arranges sale of the load*

The following events occurred on Friday, July 12, 2013.  Dimitrovski used the $10,000 cash obtained from Capital Depot to purchase the stolen load of L'Oreal products at a truck stop in Illinois.[5]  Various itinerant individuals sold merchandise at the truck stops every day.  The individual who sold the L'Oreal products to Dimitrovski was an American, whose name Dimitrovski did not know

---

[3] A pallet is "a portable platform of wood, metal, or other material designed for handling by a forklift truck or crane and used for storage or movement of materials and packages in warehouses, factories, or transport vehicles." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976).

[4] Capital Depot is an invoice factoring company that pays businesses cash in exchange for accounts receivable. *Capital Depot*, http://www.capitaldepotfactoring.com/ (last visited Mar. 5, 2015).  Initially, Dimitrovski told the agents he had obtained the $10,000 from a friend.  When pressed for the identity of his friend, however, he admitted the cash came from Capital Depot.  Dimitrovski clarified he said a friend because the two ladies who take care of his account at Capital Depot were friends of his.

[5] During his interview, Dimitrovski told agents he purchased the load the "preceding Friday."  It is clear from the record this meant Friday, July 12, 2013.  The probable cause affidavit was signed Friday, July 19, 2013, and referred to the interviews.  Dimitrovski and the others were arrested on Thursday, July 18, 2013.  Therefore, the interviews must have occurred on one of those two days.  In either case, the "preceding Friday" is July 12, 2013.

3

and whom Dimitrovski had never met before.  The American did not tell

Dimitrovski where he obtained the L'Oreal products.

Dimitrovski thought $10,000 for the load was cheap and believed the

products were stolen.  However, he thought selling the load was "the American

Dream" that would make him rich and solve his financial problems.[6]  Dimitrovski

transferred the load from the American's trailer into his own trailer.  He then

brought the load to his company's truck yard in Willowbrook, Illinois.

Dimitrovski opened a few boxes and inspected the products while checking them

against the manifest given to him by the American.  He also conducted Google

searches to ascertain the value of the L'Oreal products.

That same day,[7] Dimitrovski dispatched his associate Jorge Brache to drive

to the truck yard in Willowbrook, Illinois, with an empty trailer.  Dimitrovski and

Brache met on the job as truck drivers and had known each other approximately

five to seven years.  Dimitrovski told Brache about the L'Oreal load.[8]  Brache had

---

[6] Dimitrovski told agents he initially bought the load for his wife who owns a beauty salon, but she did not need or want the L'Oreal products so he had to resell them elsewhere.

[7] Brache stated this occurred the "previous Friday," which the record reflects was July 12, 2013.  *See* fn. 5, *supra*.

[8] According to Brache, he did not know from whom Dimitrovski purchased the load and only learned after he was arrested that Dimitrovski purchased the load for $10,000.  Brache's story is that when he arrived at the yard, he unhooked his trailer and drove his tractor under a tree while the trailer was being loaded from another trailer.  Dimitrovski returned the trailer to Brache already loaded.  The trailer was then sealed, presumably before Brache ever saw what was inside of it.  Brache also said Dimitrovski gave him a bill of lading for the shipment; however, Brache could not remember who was the shipper or to whom he was supposed to deliver the load.

a buyer in Miami, Justo Aranda Maytin.  Still on Friday, July 12, 2013,[9] Brache

contacted Maytin and told him he was selling a stolen load of cosmetics.  Brache

did not tell Maytin specifically what the load contained.  The L'Oreal load was

transferred into Brache's tractor-trailer (which was actually owned by RUS

Corporation).  Brache then transported the L'Oreal load to a truck yard in Opa-

locka, Florida, a city just outside Miami.[10]  Dimitrovski did not accompany Brache

because Dimitrovski had another cargo load[11] to take down to Miami.

C.    *July 14, 15, and 16, 2013 – Brache and Dimitrovski arrive in Miami, meet*
      *the buyer, and negotiate the sale*

Dimitrovski and Brache both arrived in Opa-locka on Sunday, July 14, 2013.

Brache arrived first; Dimitrovski arrived shortly thereafter and would spend the

night at Brache's home in Opa-locka.  That day, Maytin visited Brache at Brache's

home.  Brache gave Maytin a 32-page manifest listing the contents of the load by

the pallet.  Brache told Maytin the load was stolen but did not say where the load

came from.  Maytin gleaned from the manifest the load had come from Tennessee.

Initially, Maytin had no interest in getting involved in the load.  However, "his

---

[9] Maytin's interview states Brache contacted him the "previous Friday."  *See* fn. 5, *supra*.

[10] According to Brache, he had just arrived in Opa-locka and was going to deliver the load when Dimitrovski called him and told him not to.  When Dimitrovski arrived, he told Brache he was looking for someone to buy the load.  Then, "[b]y pure coincidence," Brache ran into Maytin in a restaurant in Hialeah, at which point he offered the load to Maytin to see if he could sell it.

[11] This cargo load was apparently legal.

drinking got in the way of his better judgment," and Maytin decided he would try to sell it.

On July 15, 2013, an informant told Federal Bureau of Investigation (FBI) agents Maytin had contacted him and offered to sell the stolen L'Oreal products. The informant was a Chilean male with whom Maytin had served time in the Miami-Dade stockade for drinking and driving charges. Maytin told the informant the products were stolen.

On July 16, 2013, Maytin took the informant to the truck yard in Opa-locka, Florida, where the products were being kept in the RUS Corporation tractor-trailor Brache had driven down from Illinois.[12] The informant looked inside the trailer and observed multiple pallets of L'Oreal products that filled up most of the trailer's fifty-three feet.[13] The shipping labels on the products matched the description and unique product codes of the stolen products. Dimitrovski and Brache also attended this meeting. They negotiated with the informant, initially requesting $250,000 cash for the entire load, but ultimately agreeing to sell the load for $170,000.[14]

---

[12] To be clear, this was not the same tractor-trailer that had been stolen at the truck stop in Tennessee.

[13] Although Maytin was brokering the L'Oreal load and led the informant to the truck yard, he claimed he never actually laid eyes on it because he "preferred to stay away."

[14] According to Brache, he knew nothing about the negotiations for the load with the Chilean and did not know the arrangement between Maytin and Dimitrovski. He also did not know anything about the negotiated price.

6

D.     *July 17, 2013 – Maytin and the buyer discuss how the load of stolen goods would be transported to Colombia*

The next day, on July 17, 2013, Maytin, the informant, and another unidentified individual met at a restaurant in Hialeah, Florida, to discuss how the load of stolen goods would be transported to Colombia. Later that day, the informant made controlled, recorded phone calls to Maytin to discuss whether a container into which the load would be transferred had arrived at the truck yard. During one of the calls, the informant asked Maytin what time the port closed. Maytin responded to the effect of "you tell your people that you're turning a stolen load into a legal one." On a later phone call that day, Maytin told the informant to meet him at the truck yard around 9:00 a.m. the next day.

E.     *July 18, 2013 – Dimitrovski discusses payment arrangements and offers to bring more loads in the future*

On July 18, 2013, Maytin and Brache met with the informant at the Opa-locka truck yard while FBI agents surveilled the meeting, both visually and aurally.[15] Agents observed Maytin and the informant arrive in a car and then observed Maytin pace back and forth holding papers in his hands. During the meeting, the informant asked Brache if the trailer was legal. Brache told him it was, and also stated the load of stolen goods had been moved between various

---

[15] Although transcripts of several recordings were provided in discovery to Dimitrovski and his codefendants, they were never introduced as exhibits or otherwise entered into the district court record.

7

containers or trailers several times and had been to many places. Maytin advised the shipping labels on the pallets would need to be removed. The informant then asked Brache who he should pay, Brache or Dimitrovski, and Brache stated the informant should pay Maytin a broker's fee and could pay either Brache or Dimitrovski for their share.

Shortly thereafter, Dimitrovski, wearing latex gloves, arrived at the tractor-trailer. Dimitrovski told the informant he could bring more loads in the future. The informant then excused himself to go get the money. After the informant left the scene, the officers and agents placed Maytin, Brache, and Dimitrovski under arrest.

## F.    *Dimitrovski's guilty plea, the PSI, and the objection*

On February 7, 2014, Dimitrovski pled guilty to count three of a three-count indictment charging him with receiving, possessing and selling stolen goods, in violation of 18 U.S.C § 2315. In preparing the PSI, the probation officer calculated a base offense level of six pursuant to U.S.S.G. § 2B1.1(a)(2). Dimitrovski received a ten-level enhancement pursuant to § 2B1.1(b)(1)(F) because the loss was more than $120,000 but less than $200,000.[16] Dimitrovski also received a two-level enhancement pursuant to § 2B1.1(b)(14)(B) because the

---

[16] According to the government, L'Oreal indicated the total retail value of the products was $578,908. Its estimated wholesale value, however, was $163,120.

offense involved an organized scheme to steal goods or chattels that are part of a cargo shipment.  Finally, Dimitrovski received a three-level downward adjustment for his acceptance of responsibility pursuant to § 3E1.1(a) and (b).  These adjustments resulted in a total offense level of fifteen.  Dimitrovski had no criminal history, resulting in a criminal history category of I.  Based on a total offense level of 15 and a criminal history category of I, Dimitrovski's guideline range was 18-24 months.

Dimitrovski's only objection to the PSI was to paragraph 28, the imposition of the § 2B1.1(b)(14)(B) organized scheme enhancement.[17]  In his objection, Dimitrovski argued the § 2B1.1(b)(14)(B) enhancement was inapplicable to the facts of his case.  Dimitrovski explained the enhancement applies only if the court finds the offense involved an "ongoing, sophisticated operation" analogous to an auto theft or "chop shop."  The enhancement could not apply to Dimitrovski because the facts show this was not an ongoing, sophisticated operation but rather "a one-time event where the defendant attempts to resell stolen items that he had purchased cheaply."

G.    *The Sentencing Hearing*

---

[17] Dimitrovski had no objections to the factual portion of the PSI or to any guideline calculations other than the § 2B1.1(b)(14)(B) enhancement.

9

At sentencing, the court heard argument on Dimitrovski's objection to the § 2B1.1(b)(14)(B) enhancement. Dimitrovski contested the enhancement did not apply because the offense was neither ongoing nor sophisticated. Dimitrovski argued "[t]here is not an ongoing sophisticated type scheme that the guidelines contemplate such as a chop shop and auto theft ring." Instead, Dimitrovski came across a person selling stolen cargo for $10,000, bought it, and attempted to resell it for $170,000, thereby relieving his financial debt. This was a one-time crime of opportunity and therefore the enhancement did not apply.

The Government responded the scheme was ongoing and sophisticated. The Government argued "it's ongoing because this offense conduct lasted over a period of two to three weeks" and Dimitrovski "negotiated the price over the course of several days." The Government further explained the defendants "made efforts to conceal their activities"; "[t]here are hundreds, if not thousands of goods, that were a part of this shipment"; and "[t]here were multiple participants," including a broker (i.e., Maytin) who helped find a purchaser in South Florida. The Government then summarized "[s]o it is ongoing and sophisticated, because it moved through several states and lasted several weeks; it required several participants." The Government acknowledged every theft of a cargo shipment is not necessarily ongoing and sophisticated, giving as an example "[m]aybe someone steals something at a truck yard off of a truck or something like that."

10

According to the government, however, "in . . . situations where giant loads are stolen and moved across state lines . . . that is ongoing and sophisticated."

Dimitrovski replied he had nothing to do with the actual theft of the cargo and by the time Dimitrovski became aware of the cargo it was already being offered for sale.  Dimitrovski emphasized "there was not an organized scheme to rob the big tractor trailer at the truck stop in Tennessee."  Dimitrovski summarized this was "a simple sale of stolen cargo in one of its simplest forms," which is not the type of "organized scheme" the Guidelines intended to punish.

After reviewing the PSI and considering the parties' arguments, the district court overruled Dimitrovski's objection and adopted the PSI in its entirety, including its findings of fact and its recommendation of a two-level increase under § 2B1.1(b)(14)(B), the organized scheme enhancement.  Accordingly, the district court sentenced Dimitrovski to 18 months' imprisonment.  Dimitrovski renewed his objection to the § 2B1.1(b)(14)(B) enhancement.  This appeal followed.

## II.  STANDARD OF REVIEW

We review a district court's interpretation of the Sentencing Guidelines and application of the Guidelines to the facts de novo, and we review the district court's findings of fact for clear error.  *United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th Cir. 2011).  We must interpret the Guidelines in light of the Commentary and Application Notes, which are binding unless they contradict the

11

Guidelines' plain meaning. *United States v. Kinard*, 472 F.3d 1294, 1297 (11th Cir. 2006). A factual finding is clearly erroneous when, upon review of the evidence, we are left with a definite and firm conviction a mistake has been made. *Barrington*, 648 F.3d at 1195. The government bears the burden of establishing the facts necessary to support a sentencing enhancement by a preponderance of the evidence. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007). Under the preponderance of the evidence standard, the trier of fact must find the existence of a fact is more probable than not. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012), *cert denied*, 133 S. Ct. 629 (2012).

### III. DISCUSSION

*A.    Parties' Arguments on Appeal*

On appeal, Dimitrovski argues his sentence was procedurally unreasonable because the district court erred in imposing the U.S.S.G. § 2B1.1(b)(14)(B) organized scheme enhancement. Dimitrovski argues the enhancement applies only to ongoing, sophisticated operations analogous to the example of an auto theft ring provided in the Application Notes to § 2B1.1. Dimitrovski contends the enhancement does not apply because this case involves only a one-time transaction in which Dimitrovski attempted to resell stolen goods he had purchased cheaply, and not a complex, ongoing operation.

The government counters the record shows Dimitrovski was involved in a scheme sufficiently organized, ongoing, and sophisticated to warrant the enhancement because Dimitrovski obtained financing to purchase the stolen goods by factoring his trucking company's invoices; inspected the products; researched their value on the internet; told Brache about the stolen cargo, who then contacted Maytin in Miami to broker the sale; negotiated the sale; moved the cargo between various locations; discussed how to transport the load to Colombia; and offered to provide similar shipments in the future.

B.    *Organized Scheme Analysis*

Section 2B1.1(b)(14) of the Guidelines provides:

If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels.

U.S.S.G. § 2B1.1(b)(14)(B).  The Commentary to § 2B1.1 explains the enhancement applies "in the case of an ongoing, sophisticated operation (e.g., an auto theft ring or 'chop shop')."  *Id.*, comment. (n. 11).

The district court found Dimitrovski's offense involved an "organized scheme" and applied the enhancement.  The district court further adopted all of the fact findings from the PSI, stating:

[T]he shipment was stolen from a truck in Tennessee and made its way to Illinois where Mr. Dimitrovski is living in financial straits, he gets $10,000 through a factoring company of ladies -- whose names he does not remember -- to purchase this load.

13

Which he puts on a tractor trailer that is registered to RUS Corporation, his trucking company, which in fact has an office with two full-time employees and leases trucks. And this load comes here where two other persons are engaged to sell it.

So, this involved not only Mr. Dimitrovski, it also involved an unknown financier and the persons down here who were hired to then get rid of the goods.

So I think the two level enhancement is, according to the case law,[18] appropriate. . . .[19]

We review the district court's finding that an organized scheme existed for clear error. *See United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir.2009) (reviewing district court's finding that defendant used sophisticated means for clear error, explaining "[w]e review the district court's findings of fact related to the imposition of sentencing enhancements . . . for clear error."). Again, in applying clear error, "we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (citations and quotations omitted).

We conclude the district court did not err, much less clearly err, in finding Dimitrovski's receipt, possession, and attempted sale of the L'Oreal products involved an "organized scheme." The facts show an organized, ongoing, and

---

[18] The cases brought up at the sentencing hearing were unpublished and therefore not authoritative.

[19] Again, Dimitrovski did not object to any of the facts contained in the PSI.

14

sophisticated operation.[20]  Dimitrovski did not simply stumble across a good deal at a truck stop and make an impulsive purchase.  Dimitrovski's crime was financed, planned, and deliberate.  He first obtained $10,000 by factoring his company's invoices with Capital Depot.  Then in the span of one day, Dimitrovski purchased the stolen cargo; Dimitrovski and Brache collaborated to load the stolen cargo onto one of Dimitrovski's trailers; Brache called Maytin to broker the sale; and Dimitrovski instructed Brache to drive the load to Miami, where Brache would meet with Maytin and show him the goods.  That Dimitrovski was able to make all these arrangements in one day reflects the crime's sophistication.

The actions of Dimitrovski and his codefendants upon arriving in Miami further display the sophisticated nature of the operation.  Like savvy businessmen, Dimitrovski and Brache met with Maytin's buyer and negotiated the price for the stolen load over the course of several days, initially asking for $250,000 but compromising for $170,000.  They also expended significant effort to conceal their illegal activities:  Dimitrovski wore latex gloves at the Miami truck yard and Maytin advised they remove the shipping labels on the stolen load so the products could not be traced back to them.  Lastly, the buyer planned to transport the goods to Colombia.  Therefore, the stolen cargo not only moved across state lines (from

---

[20] We do not decide whether the organized scheme enhancement applies when the underlying operation is organized and sophisticated, but not ongoing, because Dimitrovski's operation was all three.

Tennessee to Illinois then down to Florida); the cargo was going to be shipped down to some unknown buyer in Colombia.  Under these circumstances, Dimitrovski's receipt, possession, and attempted sale of the L'Oreal products involved a sophisticated operation.

Dimitrovski also planned for the operation to be ongoing.  After the informant agreed to buy the stolen L'Oreal load, Dimitrovski told the informant he could bring more loads in the future.  Dimitrovski's arrest before he had a chance to accomplish another transaction does not negate the ongoing nature of the scheme.  An offense may involve an ongoing, sophisticated operation even if it is committed only once.  For example, suppose a defendant sets up a "chop shop," which is the Guidelines' example of an "ongoing, sophisticated operation."  *See* § 2B1.1, comment. (n. 11).  He rents a warehouse, hires employees, establishes all the necessary connections, and has every intent of running a continuing operation—but after chopping up his first car, he is arrested.  Our case is no different from this hypothetical.  The operation is ongoing because the defendant intends for it to be so.  Dimitrovski intended to continue buying and reselling cargo with the same people, and therefore his operation was ongoing.

On these facts, we are not "left with a definite and firm conviction" the district court erred in finding Dimitrovski's offense involved an "organized scheme."  *Ghertler*, 605 F.3d at 1267 (citations and quotations omitted).

16

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Dimitrovski's sentence.