[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 17-10626
Non-Argument Calendar

————————————————

D.C. Docket No. 5:16-cr-00017-RH-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL JOSEPH WARD,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Florida

————————————————

(January 16, 2018)

Before JULIE CARNES, JILL PRYOR and HULL, Circuit Judges.

PER CURIAM:

In this direct criminal appeal, defendant Michael Joseph Ward appeals his

convictions and sentence.  Following a two-day trial, a jury found Ward guilty on all three charges in the indictment.  After thorough review of the briefs and record, we affirm.

## I.    BACKGROUND

### A.    Two Warrants for Ward's Arrest for Failure to Appear

On June 28, 2013, Ward was arrested for possession of two different controlled substances and drug paraphernalia in violation of Florida Statutes § 893.13.  Ward was in a pretrial release program.  On December 2, 2013, the Fourteenth Judicial Circuit Court ("Florida circuit court") in Bay County, Florida issued a capias warrant for the arrest of "Joseph Ward" because he failed to appear at a pretrial conference related to his three drug charges.  Subsequently, this arrest warrant for "Joseph Ward" was recalled and reissued with a corrected name, "Michael Joseph Ward."

On November 14, 2014, a separate capias warrant was issued for Ward's arrest after he failed to appear in court regarding a charge for misdemeanor criminal mischief.  Thus, Ward had two outstanding warrants for his arrest.

### B.    Search Warrant for Target Telephone

In February 2016, local law enforcement agencies and the United States Marshals Service, Florida Regional Fugitive Task Force, ("USMS Task Force") made efforts to locate fugitives in Bay County.

2

On February 3, 2016, Officer Richard Bagwell of the Bay County Sheriff's Office ("BCSO") presented a sworn application for a search warrant under Florida law to the Florida court. The application requested, inter alia, the authorized use of a cell-site simulator to assist in locating a "Target Telephone" described as the cellular telephone with the number (850) 691-6225. In support of the application, Officer Bagwell: (1) listed the above drug charges against Ward; (2) stated an active warrant for Ward's arrest existed; (3) indicated two confidential sources, including a family member, had advised that fugitive Ward was using the cellular number of (850) 691-6225; (4) represented this was the same telephone number as the contact number Ward provided to the courts; and (5) indicated the Target Telephone was believed to be used by Ward and would assist law enforcement in arresting Ward.

On February 3, 2016, the Florida court granted the application and issued a search warrant limited to a 45-day period from February 3, 2016 through March 18, 2016 for tracking the Target Telephone with cellular telephone number (850) 691-6225. During that 45-day period, the search warrant permitted BCSO to "install and use" such equipment as necessary to obtain "communication detail records," "caller identification," telephone numbers dialed, and GPS locations in relation to cell towers. This equipment included "pen register[s]," "trap and trace

3

device(s)," and "cell-site simulator technology."[1]  The search warrant also ordered

SPRINT Wireless to furnish various records pertaining to Ward's cellular

telephone and to assist in the installation and use of the various types of tracking

equipment for that cellular telephone number.

## C.    Ward's Arrest

The next day (February 4, 2016), pursuant to the search warrant, the United

States Marshals Service utilized a cell-site simulator and determined that the

Target Telephone was located near a Dollar General store in Panama City, Florida.

Members of the USMS Task Force went to the Dollar General and observed Ward

outside.  When Ward saw the police, he fled on foot but police arrested him.

On his person, the officers found a car key for a Ford Taurus, a Dollar General bag,

and a black zipper pouch containing a handgun.  The Ford Taurus was located in

the Dollar General parking lot.

During Ward's arrest, the officers approached Ward's Ford Taurus vehicle.

The odor of marijuana emanated from the Ford Taurus, which was one reason the

officers searched the vehicle.  Ultimately, the officers also towed and inventoried

the vehicle.  The officers found—among other things—four handguns, a variety of

drugs, $6,700, and a locked safe in the vehicle.  Officers later obtained a search

---

[1]Notably, this is not a case where we must determine if the government can obtain cell-site simulator information without a search warrant.  Here, the government obtained a search warrant.

4

warrant for the safe, which contained another handgun and ammunition. Thus, Ward had a total of six firearms: one on his person, four in the vehicle, and one in the safe.

## D.    Grand Jury Indictment

On June 21, 2016, a three-count indictment charged Ward with: (1) possession with intent to distribute controlled substances, including marijuana, crack cocaine, fentanyl, methamphetamine, morphine, buprenorphine, diazepam, and heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(D), (b)(1)(E), and (b)(2) (Count 1); (2) possession of six firearms[2] in furtherance of the drug trafficking crime charged in Count 1, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 2); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 3).

## E.    Hearing on Motion to Suppress

Before trial, Ward moved to suppress the evidence of the firearms and drugs. The district court conducted a two-day evidentiary hearing on Ward's motion where various officers testified.

Officer Chris Nichol with the Panama City Police Department ("PCPD") helped arrest Ward and found a firearm in the pouch Ward had on his person.

---

[2]The six firearms were (1) an Armi Tanfoglio Giuseppe .25 caliber pistol, (2) a Beemiller, Inc. C9 9mm pistol ("Hi-Point"), (3) a Sturm, Ruger & Co., Inc. ("Ruger"), SR9 9mm pistol, (4) a Ruger P89 9mm pistol, (5) a Beretta 951 9mm pistol, and (6) an Arminius N-38 Titan Tiger .38 caliber pistol.

5

Nichol testified that, upon arrival, officers identified a "gray Ford sedan" associated with Ward and observed a man pacing in front of the Dollar General store who matched Ward's description. Officers arrested Ward and searched his person, which yielded the car key and other items.[3] Nichol approached the car and smelled the odor of fresh and burnt marijuana coming from inside.

Stephen O'Brien, a Special Investigator with the BCSO, also testified. O'Brien arrived at the Dollar General after Ward was in custody and other officers had already opened the vehicle. O'Brien also smelled marijuana upon approaching the vehicle. O'Brien explained that, because "[t]he operator of the vehicle was [Ward]" and "the registration on the vehicle came back to [Ward]'s brother," BCSO's policy dictated a tow and inventory of the vehicle. O'Brien obtained a search warrant for the safe. Inside, O'Brien found a firearm and ammunition.

Officer Richard Bagwell of the BCSO Warrants Division also testified. Officer Bagwell swore to the application for the search warrant for the Target Telephone with the cell phone number (850) 691-6225. Bagwell testified that investigators obtained Ward's telephone number from two witnesses, one being his brother, as well as from an affidavit in Ward's 2014 criminal mischief case.

---

[3]Ward had the car key, the Dollar General bag, the black zippered pouch, and other items on his person when he was arrested. One of the officers placed all of the items found on Ward's person on the curb. Officers did not know the black zippered pouch contained a handgun until they retrieved the pouch from the curb, which occurred approximately 30–40 minutes after Ward's arrest. That handgun was the Armi Tanfoglio.

After these three witnesses, the district court verbally denied Ward's motion as to the use of the cell-site simulator to locate the Target Telephone (in order to locate him) because: (1) there was a valid arrest warrant for Ward, and the officers were trying to find him; (2) two sources represented the cell phone number of (850) 691-6225 was being used by Ward; and (3) the officers procured a valid search warrant to locate and find the Target Telephone with that number and were entitled to information about the location of that cell phone based on that search warrant. Likewise, even if the search warrant for the Target Telephone location was later held invalid, the district court found that the officers procured a search warrant and acted under the "good-faith exception" described in United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984).

On the second day of the evidentiary hearing, Officer Shane Tholcke, who was employed by PCPD at the relevant time, also testified. Upon arrival at the Dollar General, Tholcke noticed a gray Ford Taurus parked in the lot and observed Ward walking out of the store. Although Ward initially attempted to flee, officers apprehended him. Incident to the arrest, officers found a car key, a cellular phone, and other items on Ward's person. They also found a Dollar General bag and a black zippered pouch that contained a small firearm inside.

Officer Tholcke also testified that, while approaching the trunk of the car, both he and Officer Kevin Doheny could smell the odor of fresh marijuana

emanating from the vehicle. After concluding that marijuana was likely inside, the officers entered the car using Ward's key. Various firearms and several drugs were found in the vehicle.

Officer Doheny's testimony echoed that of Tholcke. Doheny testified that officers arrested Ward. Standing by the trunk of the car, Doheny and Tholcke smelled the odor of fresh marijuana coming from the car. Doheny put his nose to the front-passenger door and confirmed his suspicion. When Tholcke unlocked the car and opened the passenger door, the odor of marijuana became overwhelming. The officers found crack cocaine and methamphetamine in the ashtray, a police scanner on the dashboard, a Ruger P89 pistol between the driver's seat and console, and, in the passenger seat, a bag filled with currency, drug paraphernalia, marijuana, and unidentified substances.[4]

At the conclusion of this testimony, the district court denied Ward's motion to suppress the guns and drugs found in the vehicle. The district court found the officers' testimony to be "particularly credible" and truthful. The district court verbally found that the officers had probable cause to search the car based solely on the odor of marijuana before they entered the vehicle.[5] In its order dated

---

[4]At trial, O'Brien testified to finding a Ruger SR9 pistol also in this same bag.

[5]The district court found the search of the vehicle was not a valid inventory search because the relevant police policy was a "completely open-ended provision for searching as necessary for [the] safety of the vehicle [that did not] limit discretion, and [thus was] not sufficient to say this [was] an inventory search."

September 28, 2016, the district court denied Ward's motion to suppress "[f]or the reasons set out on the record of the hearing on September 6 and 26, 2016."

## F.    Trial

On October, 24, 2016, a two-day trial commenced.[6]  Before opening statements, the district court verbally denied Ward's motion to reconsider the denial of his suppression motion.  Relevant to this appeal, Ward's brother, John Thomas Ward ("Jack") testified on the second day of trial.

First, Jack testified about one of many letters he received from Ward after the arrest.  Among other things, a June 19, 2016 letter stated, "I would never ask you to lie in a court of law."  It continued, "All I would like you to do, if asked about any involvement with the car, just plead the 5th, OK?"  Jack understood this sentence to mean that Ward did not "want [him] to say anything about the car."  The letter also stated, "With your help, I can get the evidence suppressed, and get $6,700.00 in seized currency from your car—I'll give you $2,000 if you help me."

---

[6]In addition to the officers who testified at the suppression hearing, the government presented testimony from: (1) Antonio Jones, a BCSO officer who physically apprehended Ward; (2) Richard Thore, a PCPD officer who searched the trunk of the Ford Taurus and located two additional firearms and the locked safe; (3) Special Agent A.C. Llorens, who handled chain of custody for evidence found in the vehicle; (4) Jeremiah Bortle, a crime lab analyst at the Florida Department of Law Enforcement ("FDLE") who tested and quantified the drugs found in the vehicle; (5) Scott Goodlin, a senior forensic chemist at the Southeast Laboratory of the FDLE; (6) Michael Layland, President and CEO of Amtel, which is a company that provides phone services for inmates and records phone calls; (7) Patricia Simmons, a previous girlfriend of Ward; and (8) John Thomas Ward, defendant Ward's brother.

Second, Jack identified two CDs containing recorded phone calls with Ward and testified that his brother called him from jail on several occasions. In one recorded call on February 4, 2016, Ward told his brother, "Listen, you're not implemented [sic] in anything, so, you just tell them you loaned it to me a few weeks ago or whatever. Don't tell them anything, just say, you know, I need my car." At trial, Jack confirmed that he had not loaned his brother the car a few weeks ago, but rather Ward purchased the car and registered it in Jack's name. In a second phone call, Ward pleaded with his brother: "Jack, I'm not asking you—I didn't ask you to lie, but you don't have to talk to them. If you don't talk to them, you're not lying." Ward also instructed Jack, "Don't answer any questions. If they ask you about this stuff, say I don't know nothin' about it."

In another recorded phone call on March 1, 2016, Ward cautioned his brother: "I was affiliated with a conglomerate, and uhm, they're at a loss of income right now because of my incarceration. Like I said, I'm not making much money in here. And, I have no control over what goes on outside of this jail cell." After Jack admitted to turning over ammunition evidence to the BCSO, Ward responded, "You did? OK. Well, Jack, like I said, anything that happens from this point of time is out of my hands, OK? But, I instructed you what to do—you don't want to listen to me."

10

The jury found Ward guilty on all three charges.[7]

## G.    Presentence Report and Objections

Ward's Presentence Report and addendum (collectively the "revised PSR") ultimately assigned him a base offense level of 14 for Counts 1 and 3, pursuant to § 2K2.1(a)(6) of the Sentencing Guidelines.  The PSR applied (1) a two-level increase under § 3C1.1 for obstruction of justice and (2) a two-level increase under § 2K2.1(b)(1)(A) because the offense involved at least three but less than seven firearms.  As to Counts 1 and 3, the PSR calculated a total offense level of 18. Count 2 carried a mandatory consecutive sentence of 60 months of imprisonment.

The revised PSR calculated Ward's criminal history category as IV. It assessed three criminal history points for Ward's 1994 convictions in Brevard County Circuit Court for: (1) manslaughter; (2) leaving the scene of an accident; (3) assignation to commit prostitution or lewdness; and (4) possession of cocaine, all conduct occurring on November 6, 1993.  He was sentenced to 14 years on the manslaughter conviction and 5 years concurrent on the leaving the accident scene conviction.  Later, Ward was granted conditional release but violated this release on January 28, 2002 and was re-incarcerated on February 22, 2002.  Ward was released again on January 12, 2007 but violated his conditional release on

---

[7]Although the indictment included heroin in Count 1, the district court removed heroin from the jury instructions and permitted either side to mention in closing argument that the instruction was omitted because "there wasn't any evidence of heroin."

11

October 1, 2007 and was re-incarcerated on November 5, 2007.  As to these 1994 convictions, Ward was not released from custody until September 18, 2009.

The PSR assessed an additional three criminal history points for Ward's other 1994 conviction in Brevard County Circuit Court for being a felon in possession of a firearm or concealed weapon on January 29, 1993.  Ward was sentenced to 14 years of imprisonment on that firearm conviction.  The above circumstances of conditional releases, violations, re-incarceration, and the final release date of September 18, 2009—all listed in the revised PSR—are the same for this conviction.

Based on a total offense level of 18 and a criminal history category of IV, the revised PSR calculated Ward's advisory guidelines range as 41 to 51 months for Counts 1 and 3, with a consecutive 60 months as to Count 2.

Ward filed written objections to the initial PSR before it was revised.  Ward objected, inter alia, to the increase for obstruction of justice because he "explicitly told his brother not to lie in court."  Ward also objected to the six criminal history points for his various 1994 convictions on the grounds that they fell outside the 15-year look-back period for counting prior convictions.  See U.S.S.G. § 4A1.2(e)(1) (providing for inclusion of any prior sentence exceeding one year and one month "that was imposed within fifteen years of the defendant's commencement of the

instance offense" or "that resulted in the defendant being incarcerated during any part of such fifteen-year period.").

A problem with Ward's argument, however, was that, due to his re-incarcerations, Ward was not released from custody on these 1994 convictions until September 18, 2009, which fell within the 15-year window. See id. § 4A1.2(k)(2)(A) (instructing sentencing court to use "the date of last release from incarceration" when determining whether a prior sentence falls within the 15-year period, where the prior sentence involved revocation of probation, parole, supervised release, or a similar program). Ward then argued that the government presented insufficient documents to verify the 2009 disposition date as his final release date. Ward also argued the revocations of his conditional release and re-incarcerations under Florida law do not count under § 4A1.2(k) for computing inclusion in the 15-year period.

## H.    Sentencing Hearing

The district court held a sentencing hearing on February 2, 2017. As to Counts 1 and 3, Ward objected to the two-level increase for six firearms as "impermissible double counting" because of Ward's § 924(c) conviction in Count 2. The government argued that the § 924(c) crime in Count 2 required only one firearm, whereas the enhancement to Counts 1 and 3 was designed to punish

13

offenders with more than three firearms because of the increased danger.  The district court overruled Ward's objection.

As to the obstruction-of-justice increase, Ward objected and contended that he never told his brother Jack to lie to a court of law and that the context is different from other cases because they are siblings.  The government emphasized the importance of Jack's testimony at trial and argued that, among other things, Ward's reference to the "conglomerate" was a veiled threat.  The district court found that Ward's conduct went "well beyond saying don't speak," but rather it was "a suggestion to provide false information and a veiled suggestion that it might benefit the brother financially to withhold information or give false information, and that it might threaten his safety to tell the truth."

As to his criminal history, Ward argued that there was insufficient evidence to support the dates of the conditional release violations and re-incarcerations on his 1994 convictions.  Probation Officer Cynthia Wilson testified that she based the dates of the conditional releases, the re-incarcerations, and the final release on (1) a docket sheet obtained directly from the Brevard County Clerk of Court's Office, and (2) an "Inmate Release Information Detail" document obtained from the website of the Florida Department of Corrections.  On the website for the Florida Department of Corrections, Wilson obtained the "Inmate Release" document from a secure area for law enforcement requiring "special permission to gain entry."

14

Based on these documents, Wilson testified to the dates when Ward was in custody, conditionally released, and re-incarcerated, and to the fact that Ward was not finally released until September 18, 2009. The "Inmate Release" document identified Ward by name, date of birth, social security number, and photograph.

The district court overruled Ward's objection, finding that there was sufficient evidence to find that Ward was still in custody on these 1994 convictions in 2009. After the district court's ruling, Ward then argued that conditional release does not qualify as a program listed under § 4A1.2(k), and thus his re-incarcerations for violating that program should not be counted. The district court overruled this objection.

The district court adopted the revised PSR's calculations of a total offense level of 18 and a criminal history category of IV, resulting in an advisory guidelines range of 41 to 51 months' imprisonment for Counts 1 and 3 to run concurrently, with a 60-month consecutive sentence for Count 2. The district court sentenced Ward to 41 months for Counts 1 and 3 concurrently and a consecutive 60 months for Count 2.

Ward filed a timely notice of appeal.

## II.    SEARCH AND SEIZURE

On appeal, Ward challenges the district court's denial of his motion to suppress the evidence of firearms and drugs found in the vehicle. As to probable

cause, Ward asserts that the officers' testimony—that they smelled marijuana outside of the car—was not credible.[8]

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967) (footnotes omitted); see United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002).

One such exception, known as the automobile exception, permits "the police to conduct a search of a vehicle if (1) the vehicle is readily mobile[,] and (2) the police have probable cause for the search."  United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007).  The mobility requirement is satisfied by a showing that the automobile is operational.  United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003).  In Ward's opening brief, Ward concedes, as he must, that law

---

[8] As to a district court's ruling on a motion to suppress, "we review the district court's factual findings for clear error, and its application of the law to the facts de novo." United States v. Williams, 871 F.3d 1197, 1199 n.2 (11th Cir. 2017) (internal quotation marks omitted) (quoting United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000)).  In doing so, we construe the facts in the light most favorable to the prevailing party. Id.

enforcement officers may conduct a warrantless search of a vehicle when they have probable cause to believe it contains contraband.

Probable cause for a vehicle search "exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." Lindsey, 482 F.3d at 1293 (internal quotation marks omitted). It is also well established that if a police officer detects the odor of marijuana, this gives rise to probable cause. See United States v. Johns, 469 U.S. 478, 482, 105 S. Ct. 881, 884 (1985) ("After the officers came closer and detected the distinct odor of marihuana, they had probable cause to believe that the vehicles contained contraband."); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); United States v. Lueck, 678 F.2d 895, 903 (11th Cir. 1982) ("At the point marijuana was smelled by [an officer], probable cause to believe a crime had been committed . . . arose.").

In this case, law enforcement found Ward's vehicle in a Dollar General parking lot as Ward was exiting the store. Nothing in the record indicates that the vehicle was not functional. When Ward was arrested under the two outstanding warrants, officers found the key to this vehicle in his pocket. As to probable cause, Officers Doheny and Tholcke testified that they smelled marijuana emanating from

17

the vehicle prior to unlocking or opening the doors. The district court found this testimony to be "particularly credible" and truthful. A district court's credibility determinations are entitled to substantial deference. See United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003); United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).

On this particular record, Ward has not established that the district court erred in finding the officers were credible or in determining that the officers had smelled marijuana before entering the vehicle and thus had probable cause to search the vehicle.

Ward's brief lists four discrete issues on appeal: (1) whether the district court erred when it determined law enforcement had probable cause to search the gray Taurus; (2) whether it erred by including the 1994 convictions in Ward's criminal history calculations; (3) whether it erred by applying a two-level increase for the number of firearms Ward possessed; and (4) whether it erred by applying a two-level increase for obstruction of justice.

Although his brief does not identify it as an issue on appeal, Ward does briefly argue that the officers had no proper authority to use a cell-site simulator to locate his telephone and that without the simulator, the officers would not have located Ward or his vehicle. Ward's argument ignores that the officers actually obtained a search warrant to use the simulator to locate the Target Telephone.

18

In his brief on appeal, Ward makes a general, but somewhat conclusory, argument that the search warrant was vague and that the 45-day limitation period applied only to SPRINT Wireless. However, this 45-day argument is belied by the fact that the search warrant clearly provides to the contrary above the signature line, stating: "This Warrant, unless sooner renewed or terminated by a court of competent jurisdiction, will terminate forty-five (45) days from the date of its beginning operation . . . ." And the Target Telephone was located the next day.

Even assuming Ward properly preserved a simulator-search-warrant issue, we need not address any potential vagueness or other issues about the search warrant because, in any event, the officers had probable cause to search the vehicle based on the smell of marijuana alone. Moreover, in locating Ward, the officers acted in good faith in reasonable reliance upon the search warrant for the Target Telephone. See Leon, 468 U.S. at 922, 104 S. Ct. at 3420; United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002).

### III.    CRIMINAL HISTORY

Ward also challenges the district court's criminal history calculations based on two prior 1994 convictions in the PSR, which we discussed above.[9]

---

[9]For the first time on appeal, Ward also argues that his 1994 felon-in-possession conviction should not be counted as a prior conviction because it does not fall into the "category" of state offenses qualifying for conditional release under Florida law. See Fla. Stat. § 947.1405. However, the record establishes that Ward received conditional release from state incarceration for this state offense in Florida, and thus Ward, at a minimum, has not shown plain error. See

Because sentencing issues present mixed questions of fact and law, we review a district court's factual findings for clear error and their application of the Guidelines to those facts de novo. United States v. Gupta, 572 F.3d 878, 887 (11th Cir. 2009); United States v. Bradford, 277 F.3d 1311, 1312 (11th Cir. 2002).

## A.    Evidentiary Basis for the Prior Convictions

"The government bears the burden of establishing the facts necessary to support a sentencing enhancement by a preponderance of the evidence." United States v. Dimitrovski, 782 F.3d 622, 628 (11th Cir. 2015). A sentencing court "may consider all relevant information, regardless of its admissibility under the rules of evidence." United States v. Onofre-Segarra, 126 F.3d 1308, 1310 (11th Cir. 1997). Relevant information includes evidence presented during the sentencing hearing. United States v. Louis, 559 F.3d 1220, 1224 (11th Cir. 2009).

In this case, the district court did not err in finding that the documents and testimony about Ward's prior 1994 convictions were amply sufficient to establish the length of his incarceration. Ward's probation officer first identified and explained how she obtained and reviewed two documents about Ward's 1994 convictions: (1) the docket sheet sent to her directly from the Brevard County Clerk of Court's Office; and (2) the "Inmate Release Information Detail"

---

United States v. Aguilar-Ibarra, 740 F.3d 587, 592 (11th Cir. 2014) (outlining plain-error standard).

20

document, which she directly obtained from the database of the Florida Department of Corrections through a secure login portal.  The database entry identified Ward by name, date of birth, social security number, and photograph.  Likewise, the "Inmate Release" document outlined all of the specific dates of Ward's incarceration history and his final release date on September 18, 2009.  It demonstrated that Ward was in custody during the relevant time periods and that he was re-incarcerated for conditional release violations on the dates indicated in the PSR.  The district court also found that "[t]here are no other convictions that he [Ward] would have been [in prison] on in this period of time."  The district court had sufficient evidence to find that Ward was incarcerated on his 1994 convictions until 2009.  Ward has not shown these findings were clearly erroneous.

## B.    Prior Sentences under §§ 4A1.1 and 4A1.2

Section 4A1.1 of the Guidelines instructs the sentencing court to add three points to a defendant's criminal history category for each "prior sentence of imprisonment exceeding one year and one month."  U.S.S.G. § 4A1.1(a).[10] Application note 1 to § 4A1.1 instructs the sentencing court not to include "[a] sentence imposed more than fifteen years prior to the defendant's

---

[10]A "sentence of imprisonment" is defined as "a sentence of incarceration and refers to the maximum sentence imposed."  Id. § 4A1.2(b).  Included in this calculation are "[a]ny prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instance offense" and "any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period."  Id. § 4A1.2(e)(1).

21

commencement of the instant offense . . . unless the defendant's incarceration extended into this fifteen-year period." Id. § 4A1.1 cmt. n.1; see also id. § 4A1.2(e) (discussing applicable time period for prior sentences). Ward's incarceration period extended to September 18, 2009, which was within 15 years of Ward's February 4, 2016 offense conduct in this case.

When a prior offense involves a revocation of probation, parole, supervised release, or similar program, the sentencing court must look to "the date of last release from incarceration" to determine the cutoff for the prior sentence of imprisonment. See id. § 4A1.2(k)(2)(A); see United States v. Shannon, 449 F.3d 1146, 1148 (11th Cir. 2006) ("[T]he court ordinarily should count a conviction that is imposed, and on which the defendant is paroled, outside the window, when the defendant later—within the window—is incarcerated for breaching the conditions of his parole." (internal quotation marks omitted)).

Here, the instant offense occurred on February 4, 2016. The applicable 15-year look-back period for prior sentences of imprisonment began on February 4, 2001. As to his 1994 convictions, Ward was (1) sentenced to 14 years, (2) granted conditional release prior to 2002, (3) remanded for a violation of conditional release in 2002, (4) granted conditional release again in 2007, (5) remanded again for a violation of conditional release in 2007, and (6) ultimately released in 2009. Using his final release date, Ward's 1994 convictions properly fell within the 15-

year period under § 4A1.2(e)(1). Thus, the district court did not err by including the 1994 convictions in Ward's criminal history calculations.

Lastly, Ward contends that Florida's conditional release is not like the other programs listed in § 4A1.2(k) and thus, even if the revocations were accurately established in his criminal history, should not function to extend the applicable period for prior sentences of imprisonment. Ward's main arguments are that Florida conditional release is not included in the programs listed in § 4A1.2(k)(2) and that the revocation of conditional release lacks the judicial intervention required by the other programs listed in § 4A1.2(k)(2).

However, in United States v. Wright, 607 F.3d 708 (11th Cir. 2010), this Court addressed and rejected a similar argument discussing Florida's "community control" program and found that the enumerated forms of supervision located in § 4A1.2(k) are not exhaustive. Id. at 713. In Wright, we explained:

> The Sentencing Guidelines must be interpreted in accordance with federal law, even when the Guidelines refer to some event occurring in state court. The Guidelines apply to prior convictions from all fifty states, in addition to federal, foreign, tribal and military courts. As such, there is inevitably variation in the terminology utilized by the individual jurisdictions. Therefore, we look to the substance of the punishment, rather than its title.

Id. at 714 (citations omitted).

23

Our focus, then, is the substance of the program. Much like the others listed in § 4A1.2(k)(2), Florida's conditional release program allows inmates to "be released under supervision subject to specified terms and conditions," and can be revoked if terms are not met. See Fla. Stat. § 947.1405(2). Indeed, even the Florida Supreme Court has described conditional release as an "extra post-prison probation-type program." Evans v. Singletary, 737 So. 2d 505, 507 (Fla. 1999) (second emphasis added).

As to its revocability, a defendant on Florida conditional release is entitled to notice from and a hearing before the Florida Commission on Offender Review. Fla. Stat. §§ 947.01, 947.141. If the defendant elects to proceed with a hearing, he or she must be informed both orally and in writing of the alleged violation and the right to be represented, to be heard, to compel the attendance of witnesses, to produce documents, and to access all evidence against him or her. See id. § 947.141(3). This procedure is sufficiently similar to other judicially dictated revocations.

The district court did not err in determining that conditional release is materially similar to the other programs listed in in § 4A1.2(k)(2).[11] Thus,

---

[11]The district court explained its position: "Parole is listed, and they didn't list community release, and whatever somebody else tries to call it tomorrow won't be listed either, but this counts."

24

we conclude that the district court did not err by including Ward's 1994 convictions in his criminal history calculations.

## IV.    FIREARMS ENHANCEMENT

Ward next argues against the application of a two-level increase under § 2K2.1(b)(1)(A) for an offense involving at least three, but less than seven, firearms. Specifically, Ward contends that an increase based on multiple firearms constitutes "impermissible double counting" because of his separate conviction under 18 U.S.C. § 924(c) for using, carrying, or possessing a firearm in relation to a drug-trafficking crime. Ward relies heavily on application note 4 to § 2K2.4, which provides the following in relevant part:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Do not apply any weapon enhancement in the guideline for the underlying offense, for example, if (A) a co-defendant, as part of the jointly undertaken criminal activity, possessed a firearm different from the one for which the defendant was convicted under 18 U.S.C. § 924(c); or (B) in an ongoing drug trafficking offense, the defendant possessed a firearm other than the one for which the defendant was convicted under 18 U.S.C. § 924(c).

U.S.S.G. § 2K2.4 cmt. n.4.

This Court reviews a claim of double counting de novo.  See United States v. Flanders, 752 F.3d 1317, 1339–40 (11th Cir. 2014).  "Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines."  United States v. Webb, 665 F.3d 1380, 1382 (11th Cir. 2012) (internal quotation marks omitted); United States v. Dudley, 463 F.3d 1221, 1226–27 (11th Cir. 2006).  Double counting is permitted if the Sentencing Commission "intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing."  Flanders, 752 F.3d at 1340 (internal quotation marks omitted); Dudley, 463 F.3d at 1227 (internal quotation marks omitted).  "Absent a specific direction to the contrary, we presume that the Sentencing Commission intended to apply separate sections cumulatively."  Webb, 665 F.3d at 1382 (internal quotation marks omitted).

Here, we conclude the number of weapons involved in the underlying offense to a § 924(c) conviction is a separate type of offense conduct than that punished by § 924(c) itself.  See United States v. Pineda, 770 F.3d 313, 320–21 (4th Cir. 2014); United States v. Terrell, 608 F.3d 679, 683–84 (10th Cir. 2010).  The § 2K2.1(b)(1) enhancement relates to a feature of the underlying offense that provides the basis for a § 924(c) conviction—namely, quantity—whereas the

26

§ 924(c) conviction and sentence pertain to the particular manner in which the defendant used the firearm to effectuate the underlying offense.  Terrell, 608 F.3d at 684.  Specifically, the conduct at issue under § 924(c) is punishing the defendant for "putting a firearm to a prohibited purpose," like conduct in furtherance of a crime or violence or drug-trafficking.  Pineda, 770 F.3d at 321.  On the other hand, § 2K2.1(b) "reflects the Sentencing Commission's recognition that a defendant whose offense involved three or more firearms is more dangerous than a defendant who was only accountable for one or two firearms."  Id. (noting defendant whose offense involves more firearms is "more dangerous").  In short, § 924(c) pertains to particular unlawful uses of a firearm while § 2K2.1(b)(1) pertains to the number of firearms involved; these two enhancements punish different types of conduct.  Id.

Accordingly, the application of both a mandatory sentence under § 924(c) and an offense-level increase under § 2K2.1(b) does not amount to "impermissible double counting."  See id.; Terrell, 608 F.3d at 683.  The number of weapons involved in the offense underlying a § 924(c) conviction is a separate "kind of harm" than the possession or use of a firearm in relation to specific criminal conduct.  See Asante, 782 F.3d at 648; Cubero, 754 F.3d at 894; Webb, 665 F.3d at 1382; Dudley, 463 F.3d at 1226–27.  We conclude that the district court properly

27

applied a two-level increase for an offense involving more than three firearms under § 2K2.1(b)(1)(A).

## V.    OBSTRUCTION OF JUSTICE

Finally, Ward contends that the district court improperly applied a two-level increase for obstruction of justice under § 3C1.1.[12]  Specifically, he contends that communications with his brother, which were discussed at trial, were insufficient to support this enhancement.  In its response brief, the government points to these communications as evidence that Ward attempted to influence his brother—both financially and by the use of veiled threats—to lie to law enforcement and/or to not testify against Ward.

> Section 3C1.1 of the Sentencing Guidelines provides:
>
> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S.S.G. § 3C1.1.

Obstructive conduct can include, inter alia, "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so."  Id. § 3C1.1 cmt. n.4(A); see United States v.

---

[12]We review the district court's finding that a defendant obstructed justice for clear error. Unites States v. Ndiaye, 434 F.3d 1270, 1303 (11th Cir. 2006); see United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006).

28

Hesser, 800 F.3d 1310, 1332 (11th Cir. 2015) (finding obstruction where husband attempted to "go over the story line" with his wife in a tax evasion case); Bradford, 277 F.3d at 1315 ("Clearly it was not error for the sentencing judge to find [defendant's threatening inmate witnesses] was an attempt to obstruct justice . . . ."); United States v. Amedeo, 370 F.3d 1305, 1319 (11th Cir. 2004) (finding that, at a minimum, the defendant's urging a potential witness to lie constituted "unlawfully influencing" a witness under § 3C1.1); United States v. Garcia, 13 F.3d 1464, 1471 (11th Cir. 1994) (holding district court finding that the defendant obstructed justice by asking a witness not to speak to law enforcement was not clearly erroneous). This provision applies not only at trial and during sentencing but also during the course of the investigation. See U.S.S.G. § 3C1.1.

In this case, trial evidence established numerous instances of Ward's attempting to threaten, intimidate, or otherwise unlawfully influence his brother's testimony and cooperation with law enforcement. See id.

First, in his June 19, 2016 letter, Ward instructed his brother to invoke his Fifth Amendment right against self-incrimination if he was questioned about his involvement with the Ford Taurus. Second, Ward offered Jack $2,000 for his cooperation.

Third, in the February 4, 2016 phone call, although Ward had previously purchased the Ford Taurus in Jack's name, Ward again coached his brother to "tell them you loaned it to me a few weeks ago or whatever" and "[d]on't tell them anything." Fourth, in another phone call to his brother, Ward implored, "Don't answer any questions. If they ask you about this stuff, say I don't know nothin' about it."

Fifth, and perhaps most concerning, Ward mentioned in a March 1, 2016 phone call that he was affiliated with a criminal "conglomerate" and exclaimed that he had "no control over what goes on outside of [his] jail cell." When he learned that his brother had turned over evidence to law enforcement, he repeated, "Well, Jack, like I said, anything that happens from this point of time is out of my hands, OK?"

Ward's communications via letters and phone calls to his brother, whose testimony was significant in uncovering Ward's criminal conduct, was clearly meant to obstruct justice. We conclude that the district court did not clearly err by applying a two-level increase under § 3C1.1.

## VI.    CONCLUSION

For all of these reasons, we affirm the district court's denial of Ward's motion to suppress and affirm Ward's total sentence of 101 months.

**AFFIRMED.**

30