# United States Court of Appeals for the Federal Circuit

---

**UTE INDIAN TRIBE OF THE UINTAH & OURAY INDIAN RESERVATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1880

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00359-RHH, Senior Judge Robert H. Hodges, Jr, Judge Armando O. Bonilla.

---

Decided: April 25, 2024

---

MICHAEL W. HOLDITCH, Patterson Earnhart Real Bird & Wilson LLP, Louisville, CO, argued for plaintiff-appellant. Also represented by FRANCES C. BASSETT.

ANDREW MARSHALL BERNIE, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TODD KIM.

---

Before DYK, REYNA, and STARK, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Opinion concurring-in-part and dissenting-in-part filed by *Circuit Judge* REYNA.

DYK, *Circuit Judge.*

Plaintiff Ute Indian Tribe of the Uintah and Ouray Indian Reservation ("Tribe") brought suit against the United States in the Court of Federal Claims ("Claims Court") asserting various claims concerning water rights and water-related infrastructure. The First Amended Complaint ("Complaint") alleged that the United States breached duties of trust by mismanaging water rights and mismanaging water infrastructure held by the United States and operated for the Tribe, breached contracts with the Tribe, and effected unconstitutional takings of the Tribe's property. The Claims Court held that the Tribe had not identified a trust-creating source of law and dismissed all the breach of trust claims, held that one breach of contract claim was barred by a 2012 settlement agreement, and found the remaining breach of contract and takings claims time barred.

We hold that the *Winters* doctrine and the 1899 Act do not sufficiently establish trust duties to support Indian Tucker Act jurisdiction with respect to the Tribe's claims that the United States has a duty to construct new infrastructure and secure new water for the Tribe, but that the 1906 Act imposes trust duties on the United States sufficient to support a claim at least with respect to management of existing water infrastructure. Thus, as to the trust claims, we affirm in part and vacate and remand in part. With respect to one breach of contract claim, we affirm in part and vacate and remand in part. With respect to the takings claims and the other breach of contract claim, we affirm the dismissal.

## BACKGROUND

### I. Historical Background

The Tribe is a federally recognized and sovereign Indian Tribe that was organized into its present form under the Indian Reorganization Act of 1934. 25 U.S.C. § 5101 et seq. The Tribe occupies the Uintah and Ouray Indian Reservation ("Reservation"), which encompasses about four million acres in the Green River Basin of northeastern Utah and lies within the drainage of the Colorado River Basin. Approximately half of the Reservation was established by an 1861 Executive Order that was confirmed by an Act of Congress instructing the superintendent of Indian affairs for the territory of Utah to "collect and settle all or so many of the Indians of said territory as may be found practicable in the Uinta valley." Act of 1864, 38 Cong. Ch. 77, 13 Stat. 63. The other half was established by Congress in 1880. Act of 1880, 46 Cong. Ch. 223, 21 Stat. 199. Among "[t]he purposes of [the Act of 1880 was] to destroy the tribal structure and to change the nomadic ways of the Utes by forcibly converting them from a pastoral to an agricultural people." *United States v. S. Ute Tribe or Band of Indians*, 402 U.S. 159, 163 (1971) (citing 10 Cong. Rec. 2059, 2066 (1880)). Because the Reservation is exceptionally arid, year-round water supply depends upon water storage infrastructure and irrigation systems to capture and distribute winter snowmelt in the rivers running through the Reservation. In 1905, the Commissioner of Indian Affairs remarked that the Tribe's future "depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate." Complaint at 6 (quoting Rep. of the Comm. of Ind. Affs., 1906).

The history of the relationship between the Tribe and the United States with respect to water rights is long and complicated. Several events essential to the Tribe's claims here are the following:

4      UTE INDIAN TRIBE OF THE UINTAH & OURAY INDIAN v. US

The 1899 Act

• In 1899, Congress enacted an appropriations statute with a provision permitting the Secretary of the Interior to grant rights of way on or through the Uintah Indian Reservation for the construction and maintenance of dams, ditches, and canals, provided that "it shall be the duty of the Secretary of the Interior to prescribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed for their present and prospective wants." Act of March 1, 1899, 55 Cong. Ch. 324, 30 Stat. 924, 941 ("1899 Act"). The Tribe maintains that this statute created a trust obligation to secure future water rights for the Tribe.

The 1906 Act and the Uintah Indian Irrigation Project

• In 1906, Congress enacted another appropriations statute that funded the construction of "irrigation systems to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah." Act of June 21, 1906, 59 Cong. Ch. 3504, 34 Stat. 325, 375 ("1906 Act").

• These irrigation works were to be "held and operated, and water therefor appropriated under the laws of the State of Utah, and the title thereto . . . shall be in the Secretary of the Interior in trust for the Indians." *Id.*

• By about 1922, the irrigation system constructed pursuant to the 1906 Act, now known as the Uintah Indian Irrigation Project ("UIIP"), was essentially completed.

• The Tribe alleges that the infrastructure constructed under the 1906 Act today comprises several hundred miles of waterways and canals. The Tribe maintains that the 1906 statute created a trust obligation with respect to water rights and water infrastructure.

### The Central Utah Project

• In 1956 Congress authorized the Central Utah Project, a major infrastructure project to transport water from the Colorado River system to lands within Utah.

• The initial phase included the Bonneville unit, which transports water from the Reservation to the Salt Lake City metropolitan region. This initial phase depended on diverting water subject to the Tribe's water rights, water which was not then being used to irrigate lands on the Reservation. The project could not proceed without the Tribe's agreement to delay the use of this water.

### The 1960 Decker Report

• In order to quantify its claims to water rights in connection with the proposed Central Utah Project, in 1960 the Tribe employed E.L. Decker, a former employee of the Bureau of Reclamation, to prepare a report surveying present, historic, and future practicably irrigable lands within the Reservation (the "Decker Report").

• The Decker Report organized irrigable Reservation lands into seven different categories, which included four groups particularly relevant to the Tribe's claims here: Group 1, consisting of lands irrigated through the 1906 Act infrastructure with federally decreed water rights; Group 2, consisting of lands irrigated through the 1906 Act infrastructure with state-certified water rights; Group 3, consisting of lands designated as irrigable that were or could be served through 1906 Act infrastructure facilities, with some lands having a supplemental state-certified water right and other lands lacking a water right certificate; and Group 5, consisting of certain lands that were found economically feasible to irrigate but not yet irrigated.

6    UTE INDIAN TRIBE OF THE UINTAH & OURAY INDIAN v. US

The 1965 Deferral Agreement

• In 1965, after the Decker Report was completed, the Bureau of Indian Affairs ("BIA"), the Bureau of Reclamation, the Central Utah Water Conservancy District (a political subdivision of the State of Utah), and the Tribe entered into the "1965 Deferral Agreement," which provided that the Bonneville unit "may proceed without objection, interference or claim adverse to the water requirements for such unit" and that the Tribe would defer the use of water designated to irrigate Decker Report Group 5 lands until "the ultimate phase of the Central Utah project." J.A. 255–56.

• In exchange, the Tribe was granted "full and complete recognition of the water rights of said tribe, with a priority date of 1861 in groups (1), (2), (3), (4) and (5) as described in the book of claims filed with the State Engineer, State of Utah, by the Ute Indian Tribe [i.e., as described in the Decker Report], without resort to litigation." J.A. 256.

• The 1965 Deferral Agreement also required the United States to construct specific additional infrastructure units to increase the quantity of water available to the Tribe, including the Upalco unit and the Uintah unit, which were "to supply said Indian water rights by the 1st day of January, 2005," and "provide storage of the runoff waters of the Uintah River and its tributaries." J.A. 257, 258.

• These additional infrastructure units were never constructed. The Tribe alleges that the United States breached the 1965 Deferral Agreement.

The 1967 Midview Exchange Agreement

• In 1967, the Tribe, the United States, and an organization of secondary water rights users entered into the "Midview Exchange Agreement" to exchange particular water rights and irrigation facilities.

- As part of the exchange, title to "the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with all facilities and property appurtenant thereto" (hereinafter the "Midview Property") was to be transferred to BIA to "become part of the project works of the Uintah Project," and BIA was to "operate and maintain" the same "as part of the Uintah Project [UIIP]." J.A. 263.

- The Tribe contends that because the Uintah Project (UIIP) infrastructure was to be held in trust for the Tribe pursuant to the 1906 Act, the Midview Property was also meant to be held in trust, but that the United States has not transferred the property to BIA and is "using water from the Midview Reservoir to irrigate lands other than those designated for irrigation under the Midview Exchange" in violation of the agreement. Complaint at 35. It alleges that the United States failed to comply with the agreement in other respects as well.

### The Central Utah Project Completion Act ("CUPCA") of 1992

- In 1990, the United States, the State of Utah, and the Tribe attempted to negotiate a "Revised Ute Water Compact," which was intended to quantify the Tribe's water rights.[1] Congress ratified the 1990 Revised Ute Water Compact, subject to ratification by the State of Utah and the Tribe. The Tribe never ratified the 1990 Revised Ute Water Compact.

- In 1992, Congress passed the Central Utah Project Completion Act ("CUPCA"), Pub. L. No. 102-575, 106 Stat. 4600.

---

[1]   The State of Utah and the Tribe had agreed to an earlier 1980 compact, but the United States Congress did not ratify it.

• Title V of CUPCA, which concerned "Ute Indian Rights Settlement," noted that there were "unresolved Tribal claims arising out of [the 1965 Deferral Agreement]," that "construction of the Upalco and Uintah Units [required by the 1965 Deferral Agreement] has not been undertaken," and that "there is no present intent to proceed with Ultimate Phase construction." *Id.* § 501(a)(2)–(3). One of the purposes of Title V was to "put the Tribe in the same economic position it would have enjoyed had the features contemplated by the [1965 Deferral Agreement] been constructed." *Id.* § 501(b)(3). The House Committee Report further stated that the "purpose of Title V is to authorize the [Tribe] to quantify by compact its reserved water rights vis-a-vis the State of Utah and to settle long-outstanding claims against the United States arising out of the construction of the Central Utah Project." H.R. Rep. No. 102-114, pt. 1, at 69 (1991).

• CUPCA provided for economic benefits to the Tribe, which have totaled several hundred million dollars to date. One provision, section 502(a), provided that "the Tribe shall receive from the United States 26 percent of the annual Bonneville Unit municipal and industrial capital repayment obligation . . . which represents a portion of the Tribe's water rights that were to be supplied by storage from the Central Utah Project, but will not be supplied because the Upalco and Uintah units are not to be constructed." The Tribe currently receives approximately $2 million per year under this provision.

• In addition, sections 504, 505, and 506 provided $198.5 million for economic development, farming operations, and improvements to existing reservoirs, streams, and municipal water facilities.

• Receipt of these funds was conditioned on a "waiver" of "any and all claims relating to [the Tribe's] water rights covered under the [1965 Deferral Agreement]." CUPCA § 507(b). The purpose of this section was to

accomplish "a waiver of all historical claims which the tribe may have, including all claims arising out of the [1965 Deferral Agreement]." H.R. Rep. No. 102-114, pt. 1, at 127. But the waiver did not include, "and indeed preserved . . . rights which the Tribe may have under the Ute Indian Compact and under Title V itself." *Id.* at 127–28. Section 507 is ambiguous as to whether the waiver of contractual claims was imposed on the Tribe—unilaterally eliminating the contractual rights by statute—or whether the claims would be waived only if the Tribe accepted the settlement funds and agreed to the revised compact. *See* CUPCA §§ 503(a); 507.

- In its complaint, the Tribe alleges that the latter construction is correct, that the Tribe has not yet received the full amount of funds provided by these sections of CUPCA, and that the proposed 1990 Revised Ute Water Compact was never ratified. Therefore, the Tribe alleges, there was no effective settlement or waiver of the Tribe's claims under the 1965 Deferral Agreement.

### The 2012 Settlement Agreement

- In 2006, the Tribe filed a lawsuit at the Claims Court concerning the United States' alleged breach of trust in its management of CUPCA funds. This lawsuit was settled in 2012. In exchange for $125 million, the Tribe agreed to waive:

> [A]ny and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring before the date of the execution of this Settlement Agreement by both Parties and that <u>relate to the United States' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources</u>.

J.A. 273 (emphasis added).  The waiver contained an exception for claims based on the Tribe's "water rights, whether adjudicated or unadjudicated; [the Tribe's] authority to use and protect such water rights; and [the Tribe's] claims for damages for loss of water resources allegedly caused by [the United States'] failure to establish, acquire, enforce or protect such water rights."  J.A. 277.

## II. The Present Lawsuit

The Tribe filed the present case on March 7, 2018, seeking damages for breaches of trust, breaches of contract, and unconstitutional takings.[2]  After the Tribe amended its

---

[2]    The next day, the Tribe also filed a case in the United States District Court for the District of Columbia. *Ute Indian Tribe of Uintah & Ouray Reservation v. United States Dep't of Interior*, 18-cv-547, ECF 1 (D.D.C. March 8, 2018).  The complaint in that case raised similar allegations concerning the United States' fiduciary duties (including based on the 1899 and 1906 Acts), the 1965 Deferral Agreement, and the Midview Exchange Agreement, and sought declaratory and injunctive relief.  *Id.*, ECF 57, at 68–82.  Following the government's motion to dismiss, the district court determined that neither the 1899 nor the 1906 Act created enforceable trust duties and that the claims related to both the Midview Exchange Agreement and the 1965 Deferral Agreement were time barred.  560 F. Supp. 3d 247, 258, 261–63 (D.D.C. 2021).  This decision was dated September 15, 2021.  The remaining claims were transferred to the District of Utah.  *Id.* at 268.

In the District of Utah, the court granted the Tribe leave to amend its complaint.  No. 21-cv-573, 2023 WL 6276594, at *2 (D. Utah Sept. 26, 2023).  Following another motion to dismiss, the district court dismissed most claims with prejudice, agreeing with the District Court for the District of Columbia that the Tribe failed to establish common-

initial complaint, the United States moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6).

### A. Breach of Trust Claims

The complaint pled several breach of trust claims, alleging that the "United States holds legal title as trustee to the Tribe's trust lands, waters, water works, and trust funds relating to these assets." Complaint at 2. The complaint presented two basic theories of the United States' trust duties. First, the Tribe alleged that the United States has a duty to procure new water for the Tribe, including by constructing new water storage infrastructure. The Tribe primarily based this theory on the "*Winters* doctrine," under which the "Federal Government's reservation of land for an Indian tribe also implicitly reserves the right to use needed water from various sources," *Arizona v. Navajo Nation*, 599 U.S. 555, 561 (2023) (citing *Winters v. United States*, 207 U.S. 564, 576–77 (1908)), and on the 1899 Act.[3] Second, the Tribe alleged that the United States has failed to maintain the 1906 Act irrigation infrastructure and to preserve related water rights, which are held in trust by the United States for the benefit of the Tribe pursuant to the 1906 Act.

---

law trust obligations on the federal government and that claims related to the 1965 Deferral Agreement and the Midview Exchange Agreement were time barred. *Id.* at *5, *11, *17, *24. The Tribe was permitted to re-plead two claims related to a 2019 contract between the Bureau of Reclamation and the State of Utah. *Id.* at *19, *24. That case is still pending in the District of Utah.

[3] The "various sources" implicated by the *Winters* doctrine include "groundwater, rivers, streams, lakes, and springs—that arise on, border, cross, underlie, or are encompassed within the reservation." *Arizona v. Navajo Nation*, 599 U.S. at 561 (citing *Winters*, 207 U.S. at 576–77).

The Claims Court dismissed all seventeen of the breach of trust claims, holding that neither the 1899 Act nor the 1906 Act expressly created specific trust duties and that the Claims Court therefore lacked jurisdiction under the Indian Tucker Act, 28 U.S.C. § 1505.[4] *Ute Indian Tribe of Unitah and Ouray Indian Reservation v. United States*, No. 18-359 L, 2021 WL 1602876, at *4–5, *9 (Fed. Cl. Feb. 12, 2021) ("*Decision*").

### B. 1965 Deferral Agreement Claims

The Tribe also pled two claims related to the 1965 Deferral Agreement. First, the Tribe alleged in claim 14 that the United States breached the agreement by failing to "implement systems and facilities for the development of all Tribal Reserved Water Rights." Complaint at 76–77. The Claims Court held that this claim was time barred because CUPCA made clear in 1992 that the infrastructure would not be completed. Second, in the alternative and assuming that the breach of contract claims were extinguished, the Tribe alleged in claim 15 that CUPCA effected an unconstitutional taking of the Tribe's 1965 Deferral Agreement contractual rights because CUPCA purported to extinguish the Tribe's contract rights without just compensation. The Claims Court also found this claim to be time barred because the alleged taking was a discrete event—the enactment of CUPCA—and therefore "the Tribe had knowledge of the facts forming the basis of its claim in 1992." *Decision*, at *8.

---

[4]    The breach of trust claims are claims 1–9, 12, 13, 16–20, and parts of claim 21. The Tribe also relied on various other treaties and statutes as creating a trust obligation. We do not read the language of those provisions to create a specific trust obligation. Nor do we see any significance in the supposed judicial admissions by the United States in prior litigation.

### C. Midview Exchange Agreement Claims

The Tribe pled two claims related to the Midview Exchange Agreement.  First, the Tribe alleged in claim 11 that the United States breached the agreement by "failing to effectuate a transfer of the Midview Property in trust for the benefit of the UIIP" and operate it for the Tribe's benefit, which has resulted in damages because the United States diverts water from the Midview Property to irrigate other lands, reducing the amount of stored water available to the Tribe.  Complaint at 73.

The Claims Court held that this claim was barred by the 2012 settlement agreement, which "waived and released the United States from claims, known and unknown, for 'improper[ ] or inappropriate[ ]' transfer of non-monetary trust assets or resources and 'fail[ure] to undertake prudent transactions for the sale, lease, use, or disposal of [the Tribe]'s non-monetary trust assets or resources.'" *Decision*, at *8 (alterations in original) (quoting J.A. 275).  Second, the Tribe alleged that the United States physically took tribal property without just compensation through the Midview Exchange because the Tribe was compelled to give up "a portion of the Tribe's senior-priority *Winters* Reserved Water Rights" in exchange for "state-based water rights, with a priority date inferior to the Tribe's *Winters* Reserved Rights."  Complaint at 72.  The Claims Court found this claim to be time barred because "the source of the claim is the execution of the [Midview Exchange] Agreement," which occurred in 1967. *Decision*, at *8.

### D. Claims Court Judgment

The Claims Court entered judgment on February 16, 2021, dismissing all of the Tribe's claims. The Tribe timely appeals.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review de novo dismissals by the Claims Court for lack of subject matter jurisdiction, *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011), and dismissals for failure to state a claim, *Bd. of Supervisors of Issaquena Cnty., Mississippi v. United States*, 84 F.4th 1359, 1364 (Fed. Cir. 2023). We generally presume that the facts alleged in the complaint are true and draw all reasonable inferences in favor of the plaintiff. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Issaquena*, 84 F.4th at 1364. We "may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (internal quotation marks, alterations, and citation omitted).

Generally, we do not address issues not presented to the trial court or not pressed on appeal. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020). "An issue that is merely alluded to and not developed as an argument in a party's brief is deemed" forfeited. *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021). We will exercise our discretion to review forfeited issues when, among other reasons, "there is a change in the jurisprudence of the reviewing court or the Supreme Court after consideration of the case by the lower court" or an issue was not presented to the court we are reviewing but nonetheless "an issue is properly before the court." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) (quoting *Forshey v. Principi*, 284 F.3d 1335, 1356 (Fed. Cir. 2002)).

I. The Breach of Trust Claims

We first address the Tribe's breach of trust claims. While the United States has a "general trust relationship . . . [with] the Indian people," to establish jurisdiction over a breach of trust claim under the Indian Tucker Act a Tribe

first "must identify a substantive source of law that establishes specific fiduciary or other duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo I*") (internal quotation omitted). "[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* If the Tribe identifies such a statute at step one of the *Navajo I* analysis, at the second step "the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Id.* (alteration in original) (quoting *United States v. Mitchell*, 463 U.S. 206, 219 (1983) ("*Mitchell II*")).

The Claims Court dismissed all of the Tribe's breach of trust claims because the Tribe failed at step one to "establish that the United States has a specific trust obligation to ensure adequate water delivery or storage on the Tribe's Reservation." *Decision*, at *6. The Tribe's breach of trust claims fit into two broad categories. We consider each of these categories in turn.

A

In the first category of claims, the Tribe alleged that the United States has duties in trust to secure new water for the Tribe, including by constructing new water storage infrastructure. According to the Tribe, the *Winters* doctrine and the 1899 Act impose upon the United States a "fiduciary duty to [] *secure* the amount [of] water to satisfy the Tribe's present and prospective wants." Complaint at 8. The Tribe also argues that the United States has "a money-mandating fiduciary duty to provide storage facilities and other infrastructure necessary . . . to prevent unnecessary loss or waste of Tribal water." Complaint at 60. We agree with the Claims Court that *Winters* and the 1899 Act do not impose these trust duties and conclude that the Claims Court properly dismissed these claims.

The recent Supreme Court decision in *Arizona v. Navajo Nation* dealt directly with these issues. There, the Navajo Nation alleged that the treaty establishing the Navajo Reservation created affirmative duties to supply water under the *Winters* doctrine. 599 U.S. at 558–59. The Supreme Court noted that the *Winters* doctrine, without a duty-imposing treaty, statute, or regulation, does not "require the United States to take affirmative steps to secure water for [Indian] Tribe[s]." 599 U.S. at 569–70. "[T]he treaty said nothing about any affirmative duty for the United States to secure water," *id.* at 565, and "contained no 'rights-creating or duty-imposing' language." *Id.* at 564 (quoting *Navajo I*, 537 U.S. at 506). Because the United States "owes judicially enforceable duties to a tribe 'only to the extent it expressly accepts those responsibilities,'" the Supreme Court found that Navajo Nation could not sustain its breach of trust claim. *Id.* at 564 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011)).

Here, the Tribe primarily argues that the 1899 Act provides the rights-creating duties found necessary in the *Navajo I* case. The 1899 Act appropriated funds "for the purpose of paying the current and contingent expenses of the Indian Department." 30 Stat. 924. It further provided:

> That the Secretary of the Interior be . . . authorized, in his discretion, to grant rights of way for the construction and maintenance of dams, ditches, and canals, on or through the Uintah Indian Reservation in Utah, for the purpose of diverting and appropriating the waters of the streams in said reservation for useful purposes:
>
> *Provided*, That all such grants shall be subject at all times to the paramount rights of the Indians on said reservation to so much of said waters as may have been appropriated, or may hereafter be appropriated or needed by them for agricultural and domestic purposes; and it shall be the duty of the

> Secretary of the Interior to prescribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed for their present and prospective wants, and to otherwise protect the rights and interests of the Indians and the Indian service.

*Id.* at 941.

In other words, the 1899 Act allowed the Secretary to authorize rights of way for construction of facilities to divert water away from the Reservation, but in doing so the Secretary could not interfere with the Tribe's "paramount rights" to water. This is essentially an acknowledgment of a *Winters* obligation—the Secretary could not permit construction that would interfere with the Tribe's right to appropriate water from the streams of the reservation for domestic or agricultural purposes. Although the Secretary had a "duty . . . to prescribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed," this language falls short of creating a trust duty with respect to particular property. *Id.* The Secretary's duty is to establish rules and regulations. The United States has not "expressly accept[ed]" a duty to secure new water for the Tribe by construction of new infrastructure or other means. *Navajo Nation*, 599 U.S. at 564.

The complaint never alleges that the Secretary breached a fiduciary duty by failing to establish the regulations contemplated by the 1899 Act. And this duty to prescribe regulations is explicitly subject to the Secretary's discretion—he must only prescribe such regulations "as he may deem necessary"—which further demonstrates that the 1899 Act does not create a mandatory duty. 30 Stat. at 941. Finally, the language referring to a duty "to otherwise protect the rights and interests of the Indians and the Indian service" is not specific enough to create trust duties. *Id.*; *see Hopi Tribe v. United States*, 782 F.3d 622, 667 (Fed. Cir. 2015) ("[A] statute or regulation that recites a general

trust relationship between the United States and the Indian People is not enough to establish any particular trust duty."). The 1899 Act does not contain any "in trust" language, nor does it establish a corpus of particular assets or any duties with respect to them. It simply recognizes a prevailing *Winters* obligation not to interfere with the Tribe's existing rights and to prescribe regulations as may be "deem[ed] necessary" by the Secretary to protect them, which is not sufficient to create a trust obligation. 30 Stat. at 941.

Claims 2, 3, 4, 16, 17, and 18 are all premised on a purported duty of the United States to construct new infrastructure or affirmatively secure new water for the Tribe. The 1899 Act neither expressly nor implicitly imposes such duties on the United States. Therefore, we affirm the Claims Court's dismissal of claims 2, 3, 4, 16, 17, and 18 for lack of jurisdiction under the Indian Tucker Act.

B

We reach a different conclusion as to the second category of the Tribe's breach of trust claims, at least as to water infrastructure.[5] In the second category, the Tribe alleges that the United States has mismanaged particular infrastructure and specific water rights previously appropriated to the Tribe and held in trust for the Tribe's benefit. The Tribe relies on the 1906 Act as a duty-creating source of law. The 1906 Act appropriated funds:

> For constructing irrigation systems to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah . . . the cost of said entire

---

[5]    Whether the Tribe may also prevail on a claim that a trust relationship was created with respect to water rights by the 1906 Act is a question we do not decide but remand to the Claims Court, as we explain later in this opinion.

work to be reimbursed from the proceeds of the sale of the lands within the former Uintah Reservation:

*Provided,* That such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah, and the title thereto until otherwise provided by law shall be in the Secretary of the Interior in trust for the Indians, and he may sue and be sued in matters relating thereto:

*And provided further,* That the ditches and canals of such irrigation systems may be used, extended, or enlarged for the purpose of conveying water by any person, association, or corporation under and upon compliance with the provisions of the laws of the State of Utah:

*And provided further,* That when said irrigation systems are in successful operation the cost of operating same shall be equitably apportioned upon the lands irrigated, and, when the Indians have become self-supporting, to the annual charge shall be added an amount sufficient to pay back into the Treasury the cost of the work done, in their behalf, within thirty years, suitable deduction being made for the amounts received from disposal of the lands within the former Uintah Reservation.

34 Stat. at 375.

1

As to water-related infrastructure, the Tribe alleged that the irrigation systems constructed under the 1906 Act (today known as the UIIP) comprise at least several hundred miles of waterways and canals designed to irrigate 88,000 acres of land. The Tribe alleged that the United States had allowed the infrastructure to fall into "a grave state of disrepair" resulting in only 61,000 acres of land receiving water as of 2016. Complaint at 24.

The United States argues that the language in the 1906 Act merely declares a limited trust without specific, enforceable duties, relying on *United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I*"). In *Mitchell I,* plaintiffs sought damages "for alleged mismanagement of forests located on lands allotted to Indians under [the Indian General Allotment Act of 1887]." 445 U.S. at 536. The statute at issue there was apparently silent as to timber management, but provided:

> [T]he United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made . . . .

*Id.* at 541 (quoting 24 Stat. 389, as amended, 25 U.S.C. § 348). The Supreme Court explained that the statute "does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands," *id.* at 542, and noted that other sections of the statute established that "the [Indian] allottee, and not the United States, was to manage the land," *id.* at 543; *see also* 24 Stat. 388 ("[A]ll allotments set apart under the provisions of this act shall be selected by the Indians . . . in such manner as to embrace the improvements of the Indians making the selection."). Thus, the "in trust" language "created only a limited trust relationship . . . that does not impose any duty upon the Government to manage timber resources." *Mitchell I*, 445 U.S. at 542.

By contrast, several years later in *Mitchell II* the Court considered statutes and regulations requiring the Secretary of the Interior to "manag[e] the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests," to "manage Indian forest resources on the principle of sustained-yield management," and to "preserv[e] Indian forest lands in a perpetually productive state." *Mitchell II*, 463 U.S. at 220–21 (citations and internal quotations omitted).

These statutes and regulations, the Supreme Court held, sufficiently "establish[ed] a fiduciary relationship and define[d] the contours of the United States' fiduciary responsibilities" to support Indian Tucker Act jurisdiction. *Id.* at 224.

More recently, in *United States v. White Mountain Apache Tribe*, the Supreme Court considered the application of *Mitchell I* and *Mitchell II* to another statute similar to the 1906 Act at issue here. 537 U.S. 465 (2003). In *White Mountain Apache*, the statute provided that the "'former Fort Apache Military Reservation' would be 'held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes.'" *Id.* at 469 (quoting Pub. L. 86–392, 74 Stat. 8). The White Mountain Apache Tribe sought damages for the United States' failure to maintain the trust property. *Id.* The Supreme Court noted that the statutory language expressly defined a fiduciary relationship and that the United States enjoyed occupation of the trust property, which was sufficient for Indian Tucker Act jurisdiction even though the statute did not "expressly subject the Government to duties of management and conservation." *Id.* at 474–75.

The United States' position here—that the 1906 Act establishes only a bare trust with respect to water infrastructure—is inconsistent with both the text of the 1906 statute and the Supreme Court's decision in *White Mountain Apache*. The statute here expressly describes particular property—the UIIP irrigation system—and there is express fiduciary language with an identified beneficiary—the property is to be held "in trust for the Indians." 34 Stat. 375. Moreover, the "held and operated" language prescribes specific duties. *Id.* By identifying a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property, the 1906 Act bears the "hallmarks of a more conventional fiduciary

relationship." *White Mountain Apache*, 537 U.S. at 473. Thus, like the statute at issue in *White Mountain Apache*, the 1906 Act "goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee" to protect and preserve the property. *Id.* at 474–75.

The 1906 Act, by its plain text, establishes that the United States accepted a duty to "h[o]ld and operate[]" the described irrigation systems "in trust for the Indians." 34 Stat. 375. The Tribe also pled a breach of this duty, namely that the United States has allowed the 1906 Act infrastructure to fall into "a grave state of disrepair." Complaint at 24. These allegations are sufficient to clear the first step of the jurisdictional analysis in *Navajo I* with respect to the failure to maintain water infrastructure. The Tribe has identified "a substantive source of law that establishes specific fiduciary or other duties," and that the complaint sufficiently "allege[d] that the Government has failed faithfully to perform those duties," as required for Indian Tucker Act jurisdiction. *Navajo I*, 537 U.S. at 506.[6]

---

[6]    The United States argued on appeal that it does not exercise "exclusive authority to use and occupy th[e] property," contending that the lack of exclusive control distinguishes *White Mountain Apache*. Oral Arg. at 27:00–28:25. The Tribe's complaint alleged that the United States, through the BIA, exercises "pervasive and comprehensive control of the UIIP," including through assessing operation fees, performing maintenance and rehabilitation, regulating project structures, and executing carriage agreements with other water users. Complaint at 22–25. The United States did not challenge any of the factual allegations relating to the trial court's jurisdiction. At this stage of the proceedings, we must take the well-pled factual allegations of the operative complaint as true. *Reynolds*, 846 F.2d at

We next turn to the second step of the *Navajo I* jurisdictional analysis, "whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties.'" 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 219). "This 'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity." *White Mountain Apache*, 537 U.S. at 472. A statute need only "be reasonably amenable to the reading that it mandates a right of recovery in damages . . . a fair inference will do." *Id.* at 473. In addition, "[a]t the second step of the jurisdictional analysis . . . common-law trust principles come into play." *Hopi Tribe*, 782 F.3d at 668.

We again find *White Mountain Apache* instructive. There, as here, "the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee" because "a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *White Mountain Apache*, 537 U.S. at 475 (citing, *inter alia*, Restatement (Second) of Trusts § 176 (1957)); *see also* Restatement (Third) of Trusts § 76 (2007). Here, as in *White Mountain Apache*, "it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." 537 U.S. at 476 (quoting *Mitchell II*, 463 U.S. at 226). We find that the duties prescribed by the 1906 Act can be fairly interpreted as money-mandating, and, therefore, that the second element of the *Navajo I* jurisdictional analysis is satisfied as to the water infrastructure claims.

---

747. Therefore, given that the complaint alleged exclusive control, we do not decide whether such a showing of exclusive control is required by *White Mountain Apache* as argued by the United States.

The United States argues that the 1906 Act cannot create trust duties because the Department of Interior's "mandate" is "to manage the Project for the benefit *of both* Indians and non-Indians," which is "incompatible with the notion that it imposes enforceable fiduciary duties owed specifically to Plaintiff." Appellee's Br. 21. The 1906 Act contains no such mandate. While the "ditches and canals of such irrigation systems may be used, extended, or enlarged for the purpose of conveying water by any person, association, or corporation," 34 Stat. 375, this does not, as the United States contends, require the Secretary to consider the benefits to those non-trustee users.

Moreover, allowing the United States to use the infrastructure for the benefit of non-Indians is not inconsistent with the existence of a trust obligation. The Supreme Court's decision in *Jicarilla* is instructive. There, the Court considered whether the United States, acting as a trustee, could assert attorney-client privilege and withhold communications from an Indian Tribe beneficiary. *Jicarilla,* 564 U.S. at 165–66. The common law's fiduciary exception barred any such claim of attorney-client privilege, but the Supreme Court held that the United States could choose to structure the trust relationship to avoid such a principle, noting that the United States "is not a private trustee," and Congress may choose "to structure the Indian trust relationship in different ways." *Id.* at 173, 178. Likewise, the trust obligations created by the 1906 Act's express duties to hold and operate the infrastructure for the Tribe's benefit are not defeated by a provision allowing the Secretary to provide for third-party use. We hold that claims 1 (to the extent it concerns maintenance of 1906 Act infrastructure and not further construction), 5, 6, 7, 8, 9, 12, 13, 19, 20, and 21 (to the extent it concerns operation of 1906 Act infrastructure but not in other respects), plead a breach of trust premised on the alleged failure of the United States to maintain and operate the 1906 Act infrastructure for the benefit of the Tribe. Because the

1906 Act sufficiently sets forth a source of law to establish these duties at the pleading stage, we vacate the Claims Court's dismissal of these infrastructure claims and remand.

Relatedly, the Tribe contends that the United States has a trust obligation not to allow use of the infrastructure by third parties without the Tribe's approval and sufficient compensation to the Tribe. The Tribe alleged that the United States had mismanaged the infrastructure by entering "informal agreements allowing non-Indian irrigation companies and other non-Indian irrigators to utilize . . . [the] infrastructure for their own benefit." Complaint at 37. The Tribe has not presented further argument on this point, nor did the Claims Court address it in any detail. At this stage of the proceeding, we think it premature to address the question of whether allowing third-party use is a breach of the United States' fiduciary duties (except to the extent that we hold that such third-party use is not inconsistent with the obligation to protect and preserve the property).

2

We finally address the Tribe's breach of trust claims concerning water rights based on the 1906 Act. Although we have concluded that the 1906 Act can fairly be read as creating a trust relationship obligating the United States to protect and preserve the water infrastructure, the Tribe contends that the United States' trust duties include a general obligation to protect and preserve water rights. The language of the 1906 Act is less than clear on this point, but the Tribe alleges here, *inter alia*, that the United States violated this duty by effecting "transfers of the Tribe's water rights . . . from Indian lands to non-Indian lands under the UIIP and from Indian lands on the Reservation to non-Indian lands outside of the UIIP." Complaint at 30. Specifically, the Tribe alleged that the Decker Report—which the Tribe commissioned in 1960 to quantify its claims to

water rights, and upon which the Tribe relied to define its claims here—identified three groups of lands served by 1906 Act facilities with recognized appurtenant water rights (Groups 1, 2, and 3). Claim 7 of the Complaint alleged that transfers of these water rights by the government were improper. The Tribe also alleged in claim 9 that the United States' execution of the Midview Exchange Agreement somehow constituted mismanagement of the Tribe's water rights. Similarly, the Tribe alleged in claim 19 that the transfer of Decker Report Group 2 water rights to the Duchesne Townsite, which was accomplished through an act of Congress, Pub. L. No. 106-370 (2000), breached the United States' trust obligations under the 1906 Act. Claims 9 and 19 asserted that damages are owed because the United States failed to ensure that the Tribe received access to replacement water and adequate compensation for the transfers.

The Claims Court did not specifically address these claims, likely because the government did not present the issue to the court separately from the *Winters* arguments. Nor do the parties brief these issues on appeal in any detail, focusing instead on the infrastructure issue. Nonetheless, other breach of trust claims relating to the 1906 Act will go forward in the Claims Court, and we believe "injustice might otherwise result" were we not to remand for an opportunity for the Claims Court to consider these claims. *Forshey*, 284 F.3d at 1353 (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)). We also perceive a predicate, jurisdictional issue which has received little attention from the parties—whether claims 7, 9, or 19 as for water rights would survive the time bar, since the transfers at issue occurred in the 1940s, in the year 1967, and in the year 2001, respectively.

The Tribe also contends that the United States under the 1906 Act had an obligation to secure additional water for the Tribe. For the same reasons that we found no such trust obligation in the 1899 Act, we find no such obligation

in the 1906 Act. The Tribe also contends that the United States had a trust obligation to expand the 1906 Act infrastructure at the government's expense. While the 1906 Act obligated the United States to "construct[] and complete[]" the "irrigation systems," we do not read the 1906 Act as imposing any such obligation on the government as trustee. 34 Stat. at 375. Even under the common law of trusts, there is no duty to expand the trust corpus at the trustee's own expense. *See* Restatement (Third) of Trusts § 88 cmt. a (2007) (recognizing a right of reimbursement for expenses properly incurred). The 1906 Act does not itself create a trust duty to construct the full scope of the project initially contemplated in the statute. *See Hopi Tribe*, 782 F.3d at 669 (declining to find that holding reserved water rights in trust implicitly imposes a duty to provide water infrastructure). Rather, under the 1906 Act it is the title to the facilities actually built that shall be held in trust. To the extent claim 1 or any others plead for relief from the United States' failure as trustee to construct the full scope of the project initially contemplated, the 1906 Act does not support Indian Tucker Act jurisdiction.

We note that the Tribe relies on a provision allowing the Secretary to "sue and be sued in matters relating" to the 1906 Act. 34 Stat. at 375. We do not read that provision as itself creating a cause of action for breach of trust.

## II. The 1965 Deferral Agreement Claims

### A

We turn next to the Tribe's claims that the United States has breached the 1965 Deferral Agreement. First, in claim 14, the Tribe alleged "the United States has blatantly foregone any effort to satisfy Tribal Reserved Water Rights as promised in the 1965 Deferral Agreement" through the construction of promised infrastructure. Complaint at 76. The 1965 Deferral Agreement provides:

> If the ultimate phase of the Central Utah project is not completed sufficiently to supply said Indian water rights by the 1st day of January, 2005, equitable adjustment will be made in accordance with said reserved and perfected water rights of the tribe to permit the immediate Indian use of the water so reserved. It is agreed that the first day of January, 2005, shall be mutually considered as the maximum date of deferment and that all phases of the Central Utah project will in good faith be diligently pursued to satisfy all Indian water rights at the earliest possible date.

J.A. 257 (emphasis omitted). The Claims Court dismissed claim 14 as time barred because "the Tribe knew as early as 1980 that the Uintah and Ute Indian Units contemplated by the 1965 Deferral Agreement would not be constructed." *Decision*, at *9. On appeal, the Tribe contends that the 1965 Deferral Agreement gave a <u>commencement</u> date of January 1, 2005, for projects to supply Indian water rights, which allows for completion within a reasonable amount of time, and that construction of irrigation and storage projects has been ongoing to the present day. We disagree with the Tribe's reading of the 1965 Deferral Agreement.

On its face, the agreement provides that the project must be "<u>completed</u> sufficiently to supply said Indian water rights by the 1st day of January, 2005," or else "equitable adjustment will be made." J.A. 257 (emphasis added). Thus, on the facts alleged in the complaint, January 1, 2005, is the <u>latest</u> date on which the construction-related aspects of the claim accrued; the equitable adjustment language cannot be read to support that construction would begin in 2005. We agree with the Claims Court's dismissal of the construction-related aspects of claim 14 under 28 U.S.C. § 2501. We have no occasion to determine what obligations would be imposed on the United States with respect to the "equitable adjustment" language since the

Tribe has not at this point coherently alleged a breach of this obligation. Even if 2005 were not the latest date for construction, we think that the Claims Court was correct in its conclusion that, as early as 1980, the Tribe knew that the construction was not going to occur and that the claim accrued decades ago. Therefore, we affirm the Claims Court's determination that claim 14 is time barred.

## B

While the Tribe's primary theory is that the 1965 Deferral Agreement claims survived the 1992 CUPCA statute,[7] claim 15 pled in the alternative that, if section 507 of CUPCA extinguished the Tribe's property interest in "contractual rights and legal claims arising under the 1965 Deferral Agreement," then CUPCA constituted a taking. Complaint at 77. The Tribe contends that the compensation provided by CUPCA included both the funds and projects defined in Title V (titled "Ute Indian Rights Settlement") and also the funds and projects defined in Title II, Section 203 (titled "Uinta Basin Replacement Project"), and that this did not constitute adequate compensation for the taking of the defined contract rights. The Claims Court dismissed claim 15 as time barred because the compensation scheme in CUPCA was fixed in 1992. *Decision*, at *8. The Tribe argues that the stabilization doctrine saves the claim because "the Tribe was entitled to [defer filing suit until it could] first see whether the United States would fulfill its promise to mitigate the impacts of the purported 'waiver' of the 1965 Deferral Agreement through the construction of the Uintah Basin Replacement Projects." Appellant's Br. 47. The Tribe alleged that these projects are ongoing through the present

---

[7] This theory only has relevance with respect to the non-construction claims based on the 1965 Deferral Agreement because we have held that the construction claims are time barred.

day.  We assume, without deciding, that the stabilization doctrine applies here, in the context of a regulatory taking. However, even on this assumption, we agree with the Claims Court.

Our cases have "'soundly rejected' the notion 'that the filing of a lawsuit can be postponed until the full extent of the damage is known.'"  *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1354 (Fed. Cir. 2011) (quoting *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000)). Rather, stabilization occurs when "the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable."  *Boling*, 220 F.3d at 1371.  In a case involving a statute, "it is fundamental jurisprudence that the [a]ct's *objective* meaning and effect were fixed when the [a]ct was adopted."  *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993). Here, the effect of the Uinta Basin Replacement Project provision in Title II of CUPCA was apparent as of CUPCA's adoption in 1992.  Pub. L. No. 102-575, § 203(a)–(b).  Section 203 provided that the projects were discretionary and contingent on feasibility and environmental studies.  The Tribe's theory is that what the government constructed under these discretionary provisions turned out to be insufficient compensation.  That is not adequate to invoke the stabilization doctrine (assuming it applies); the Tribe could have argued in 1992 that the discretionary nature of the projects rendered them inadequate compensation.  Therefore, we affirm the Claims Court's determination that claim 15 is time barred.

III. The 1967 Midview Exchange Agreement Claims

A

In addition to the breach claim with respect to the 1965 Deferral Agreement, the Tribe also alleged a second breach of contract, claim 11, concerning the 1967 Midview Exchange Agreement, which provided that the Midview Property (i.e., water infrastructure covered by the agreement)

would be "transfer[red] to Indian Affairs" and "become part of the project works of the Uintah Project." J.A. 263. Claim 11 alleged that the United States breached the Midview Exchange Agreement by "failing to effectuate a transfer of the Midview Property in trust for the benefit of the UIIP," which the Tribe further characterized as a failure to "complete[] the underlying paperwork to formally transfer the Midview Property from [the Bureau of Reclamation] to BIA." Complaint at 34, 73. While stated as a breach of contract claim, the claimed damages are alleged to be those that would be received on a breach of trust theory if the property had been transferred to the trust.[8]

The Claims Court held that claim 11, insofar as it concerns water infrastructure, is barred by the 2012 settlement agreement because it "relate[s] to the United States' management or accounting of . . . Plaintiff's non-monetary trust assets or resources." J.A. 273; *see Decision*, at \*8.

On appeal, the Tribe argues that claim 11 does not implicate the 2012 settlement agreement in this respect because the Midview Property never became a trust asset. We reject the Tribe's theory. We read the settlement agreement as covering both assets that were in trust and assets that should have been transferred in trust. To the extent that claim 11 concerned infrastructure, we think that a claim that such infrastructure was mismanaged is a claim that "relate[s] to the United States' management" of that purported trust asset (i.e., a non-monetary trust asset), and claims "based on harms or violations occurring before the date of the execution of [the 2012] Settlement Agreement,"

---

[8]    Claim 8 directly alleged a breach of trust with respect to the Midview Property. It is unclear whether this claim has independent significance given the breach of contract theory, and also unclear whether a breach of trust claim can be stated for failure to transfer assets into trust. We leave these issues to be addressed on remand.

which was March 8, 2012, are barred.  J.A. 273.  We affirm the dismissal of claim 11 insofar as it concerned infrastructure.

The Tribe also alleged that it received particular water rights under the Midview Exchange Agreement, and that the federal government has improperly diverted water owned by the Tribe to other users in violation of the agreement.  The 2012 agreement expressly excluded from waiver claims concerning:

> Plaintiff's water rights, whether adjudicated or unadjudicated; Plaintiff's authority to use and protect such water rights; and Plaintiff's claims for damages for loss of water resources allegedly caused by Defendants' failure to establish, acquire, enforce or protect such water rights.

J.A. 277.  The question of whether the Midview Exchange includes water rights was not a focus of the parties or the court below.  Given the explicit exceptions in the 2012 settlement that the Claims Court relied upon, three questions remain: (1) whether there are water rights under the Midview Exchange Agreement, (2) whether the complaint adequately pled a breach of contract with respect to water rights, and (3) whether the exception in the 2012 settlement applies.  We vacate the Claims Court's dismissal of claim 11 and remand for consideration of these issues.

B

Claim 10 alleged that the Midview Exchange Agreement in other respects constituted a "per se physical taking" because the Tribe was deprived of a portion of its "senior-priority" water rights, which were originally

recognized in a 1923 District of Utah decree.[9]  Complaint at 72.  While the exchange agreement provided for a transfer of those rights, the Tribe alleged it received inadequate compensation in the form of "state-based water rights, with a priority date inferior to the Tribe's *Winters* Reserved Rights and with the prospect of forfeiture through non-use."  *Id.*  The Tribe's theory appears to be that the property the Tribe received in the exchange was inadequate, and therefore the Tribe did not receive just compensation for the property given up in the exchange.  The Claims Court found that claim 10 is barred by the statute of limitations because "the source of the claim is the execution of the [Midview Exchange] Agreement," and thus any takings claim accrued in 1967.  *Decision*, at *8.

On appeal, the Tribe contends that the stabilization doctrine saves the claim because "subsequent acts and omissions by the United States [have] gradually increased the disparities between the value of the senior-priority water rights . . . and what the Tribe received in exchange," including the United States "(1) failing to transfer the Midview Property into trust for the Tribe" and "(2) classif[ying] [] Indian lands that would otherwise receive irrigation water from Duchesne River pursuant to the Midview Exchange as temporarily or permanently non-assessable [i.e., not eligible to receive irrigation water], without fulfilling its responsibility to render such lands assessable again."  Appellant's Br. at 41–42.  We disagree with the Tribe that these allegations were improperly dismissed.

Unlike the takings claim with respect to the 1965 Deferral Agreement, the claim with respect to the Midview

---

9    The Tribe cited *United States v. Cedarview Irrigation Co.*, No. 4427 (D. Utah 1923) and *United States v. Dry Gulch Irrigation Co.*, No. 4418 (D. Utah 1923) as the cases resulting in this decree.

Exchange Agreement does not rest on alleged legislative abrogation of preexisting contract claims. Rather, the claim is that the bargained-for consideration either was not provided or had less value than was anticipated. We do not see how inadequacy of a bargained-for exchange, whether a party is dissatisfied at the time of the bargain or afterwards, could result in a taking. "We have held that when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001)). Although we have vacated the Claims Court's dismissal of the Tribe's breach of contract claim concerning the Midview Exchange Agreement, this breach allegation cannot sustain the Tribe's takings claim, which was properly dismissed.

Finally, the Tribe alleges that a taking occurred because the Midview Exchange Agreement violated 25 U.S.C. § 177, the Indian Non-Intercourse Act.[10] The Tribe's theory on this point appears to be that there was a taking because the BIA transferred away the Tribe's federally-decreed water rights illegally. Even assuming, without deciding, that a violation of the Indian Non-Intercourse Act could give rise to a claim for money damages, a violation of the Indian Non-Intercourse Act cannot be the basis of a takings claim. *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001) ("[T]o the extent that the plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation, *Del-Rio* does not give

---

[10] "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

the plaintiff a right to litigate that issue in a takings action rather than in the congressionally mandated administrative review proceeding." (discussing *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998))).

Accordingly, we affirm the Claims Court's dismissal of claim 10.

## IV. Alternative Grounds for Dismissal

The United States argues that this court should consider specific alternative grounds to affirm the dismissal of any claims for which we vacate the Claims Court's decision. For example, the United States contends that most of the surviving breach of trust claims are time barred, and that several of them are barred by the 2012 settlement agreement. While it is true that "we may affirm a judgment of the trial court on any ground supported by the record, . . . [t]he decision whether to do so . . . lies within our discretion." *El-Sheikh v. United States*, 177 F.3d 1321, 1326 (Fed. Cir. 1999). We do not reach these alternative grounds on appeal.

The United States also argues that all remaining claims should be barred by 28 U.S.C. § 1500, which provides that the Claims Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or process against the United States" or its agents. As the United States acknowledges, we held in *Resource Investments, Inc. v. United States* that "the § 1500 bar operates '*only* when the suit shall have been commenced in the other court *before* the claim was filed in [the Claims Court].'" 785 F.3d 660, 669 (Fed. Cir. 2015) (alteration in original) (quoting *Tecon Eng'rs, Inc. v. United States*, 343 F.2d 943, 949 (Ct. Cl. 1965)). Because the Claims Court action was filed before the District of Columbia action, *see supra* n.2, under our precedent section 1500 does not apply.

## V. Remand

On remand, the Claims Court may order the Tribe to replead the surviving claims for purposes of clarity and may consider the United States' alternative grounds for dismissal. The court also urges the parties to consider comprehensive settlement of the remaining claims in light of what appears to be costly and protracted future litigation.

## CONCLUSION

We affirm the Claims Courts' dismissal of claims 2, 3, 4, 10, 14, 15, 16, 17, and 18. We affirm in part and vacate in part the dismissal of claims 1, 5, 6, 7, 8, 9, 11, 12, 13, 19, 20, and 21, and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**

## COSTS

Costs to neither party.

# United States Court of Appeals for the Federal Circuit

---

**UTE INDIAN TRIBE OF THE UINTAH & OURAY INDIAN RESERVATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1880

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00359-RHH, Senior Judge Robert H. Hodges, Jr, Judge Armando O. Bonilla.

---

REYNA, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I am pleased to join my colleagues for most of the majority opinion. But I depart that union in part because I believe the 1899 Act is a duty-imposing source of law sufficient to support Indian Tucker Act jurisdiction over the Tribe's breach of trust claims.

The 1899 Act is about tribal water. Act of March 1, 1899, 55 Cong. Ch. 324, 30 Stat. 924, 941. It gives the Secretary the discretion to grant rights of way to others for construction and maintenance of water infrastructure, subject to the paramount rights of the Tribe. *Id.* And it expressly places on the Secretary a "duty . . . to prescribe such

2      UTE INDIAN TRIBE OF THE UINTAH & OURAY INDIAN v. US

rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed for their present and prospective wants, and to otherwise protect the rights and interests of the Indians[.]"[1]  *Id.*

This case is unlike the treaty at issue in *Arizona v. Navajo Nation*, 599 U.S. 555 (2023) because, here, the 1899 Act imposes actionable fiduciary duties on the government.

---

[1]    The majority ascribes specific fiduciary duties to particular sources of law and, in turn, to particular claims in the Tribe's first amended complaint.  As a result, the majority leaves unaddressed important aspects of the acts.  For example, the majority characterizes the 1899 Act as relating solely to "duties in trust to secure *new water* for the Tribe, including *by constructing new water storage infrastructure*."  Maj. Op. 15 (emphasis added).  As a result, the majority considers the 1899 Act as isolated to new infrastructure and not about access to existing water.  Each act should be individually interpreted and considered based on its language.  *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms.").  The Court of Federal Claims did not engage in an analysis separating the Tribe's causes of action and ascribing alleged fiduciary duties between the 1899 and 1906 Acts, and I fault the majority's decision to do so.  As concerns the Tribe's breach of trust claims, I concur only in the majority's conclusion that the 1906 Act creates actionable trust duties requiring vacatur and remand.  I do not join the manner in which the majority allocates alleged fiduciary duties between the 1899 and 1906 Acts, nor its peculiar assignment of the Tribe's breach of trust causes of action between the two acts.

Although the *Navajo Nation* treaty set aside a reservation for the Navajo and thus implicitly created reserved water rights for the Tribe, it did not create "a duty on the United States to take affirmative steps to secure water for the Tribe." *Id.* at 566. In comparison, the 1899 Act expressly relates to water. In granting the Secretary discretionary authority over building and maintaining water infrastructure, it expressly places on the Secretary a "***duty . . . to prescribe such rules*** and regulations as he may deem necessary ***to secure to the Indians*** the quantity of ***water*** needed for their present and prospective wants." 30 Stat. at 941 (emphasis added).

With such express language provided, there was no need for the 1899 Act to explicitly refer to water and water infrastructure as being held "in trust" for it to create actionable fiduciary duties. Nor does it matter that the 1899 Act permits the Secretary to choose rules and regulations "as he may deem necessary." *Id.* The specific rules and regulations created may be up to the Secretary, but there is nothing permissive in the 1899 Act about the Secretary's ultimate duty to prescribe sufficient rules and regulations to secure for the Tribe "the quantity of water needed for their present and prospective wants." *Id.* I am at a loss as to how the language of the 1899 Act can be understood to mean that the Secretary has the discretion to *not* secure water to the Tribe.

The majority decision regarding the 1899 Act is another in a drip line of cases eroding promises that the United States clearly and objectively made to tribal nations. Those promises were from one sovereign state to another, couched in legal terms with all the trappings of legality. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 667–68 (2022) (Gorsuch, J., dissenting) ("Tribes are not private organizations within state boundaries. Their reservations are not glorified private campgrounds. Tribes are sovereigns."). The plain language of the 1899 Act creates

4          UTE INDIAN TRIBE OF THE UINTAH & OURAY INDIAN v. US

fiduciary obligations on the Secretary that are objectively clear and unambiguous.  I thus respectfully dissent in part.